Juvena **JENKINS**, et al.,
**Plaintiffs-Appellees,**

v.

William M. **BOWLING**, Director, Illinois
Department of Labor, et al.,
**Defendants-Appellants.**

No. 82–1356.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 23, 1982.

Decided Nov. 1, 1982.

Imelda R. Terrazino, Deputy Atty. Gen., Chicago, Ill., for defendants-appellants.

Jeffrey B. Gilbert, Legal Asst. Found., Chicago, Ill., for plaintiffs-appellees.

Before BAUER, POSNER and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

We are asked to decide the constitutionality of a portion of section 602 B of the Illinois Unemployment Insurance Act, Ill. Rev.Stat. 1981, ch. 48. Section 602 B denies unemployment benefits to anyone "discharged because of the commission of a felony in connection with his work, or because of theft [which may be either a felony or a misdemeanor, see Ill.Rev.Stat.1981, ch. 38, § 16–1] in connection with his work, for which the employer was in no way responsible," provided that either the employee has admitted the act in writing or the act "has resulted in a conviction by a court of competent jurisdiction." This much of section 602 B is unchallenged. However, the section goes on to provide "that if by reason of such act, [the person claiming unemployment benefits] is in legal custody, held on bail or is a fugitive from justice, the determination of his benefit rights shall be held in abeyance pending the result of any legal proceedings arising therefrom." This class action against the officials who administer Illinois' unemployment insurance program challenges the "held in abeyance" proviso—which so far as we know has no counterpart in any other state's unemployment law—as a violation of both the supremacy clause of Article VI of the Constitution and the due process clause of the Fourteenth Amendment. The district court held the proviso unconstitutional under both clauses and, by way of remedy, directed the defendants to offer people whose claims are postponed under section 602 B the same administrative procedure, involving a hearing and sev-

eral layers of appellate review, that the state offers people whose claims are initially denied under other provisions of the Illinois Unemployment Insurance Act. See Ill. Rev.Stat.1981, ch. 48, §§ 450–53, 455–56, 470–74. We begin and for reasons that will eventually appear end our consideration of the merits with the supremacy clause.

Though administered at the state level in accordance with criteria for eligibility largely determined by each state, unemployment insurance is partly financed by the federal government, which naturally has attached some strings to its largesse. The two strings that are relevant to this case are sections 303(a)(1) and (3) of the Social Security Act, 42 U.S.C. §§ 503(a)(1), (3).

Section 303(a)(1) forbids the Secretary of Labor to allow federal money to go to a state to help the state defray the costs of administering its unemployment compensation program unless the state's unemployment insurance law makes provision for "such methods of administration . . . as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due." Pursuant to this grant of rule-making authority, see *Wilkinson v. Abrams,* 627 F.2d 650, 660 (3d Cir. 1980); 42 U.S.C. § 1302, the Department of Labor has issued regulations requiring "prompt determination of eligibility" and administrative methods that "will reasonably insure the full payment of unemployment benefits to eligible claimants with the greatest promptness that is administratively feasible" and that are "reasonably calculated to insure full payment of unemployment compensation when due." 20 C.F.R. §§ 640.1(a)(2), 640.3(a), 650.1(b).

Section 303(a)(3) forbids the Secretary to allow federal money for administrative costs to go to a state that does not provide "opportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied." There are regulations under this section too but they add nothing so far as the issues in this case are concerned.

As an original matter one might wonder how a state statute could be challenged as inconsistent with section 303(a) of the Social Security Act, and hence as invalid under the supremacy clause, when section 303(a) does not purport to require anything of the states. A state can have any kind of unemployment compensation scheme it wants, at least so far as the Social Security Act is concerned, provided it does not insist on receiving federal money. Since the Act is addressed not to the state but to the Secretary of Labor, one might think the appropriate remedy for a violation was an order forbidding the Secretary to pay money to the noncomplying state for its unemployment-compensation program, which is not what the plaintiffs in this case have asked for; or, less obviously, an order forbidding the state to use federal money unless it conforms its unemployment insurance law to the requirements of the Social Security Act. Such a remedy was upheld in *Rosado v. Wyman,* 397 U.S. 397, 420–422, 90 S.Ct. 1207, 1221–1222, 25 L.Ed.2d 442 (1970), but is not what the plaintiffs want either. They just want the held in abeyance proviso enjoined.

Despite the lack of any obvious basis in the language of section 303(a) for such a remedy, the Supreme Court, though without discussion of the issue beyond an extremely cryptic dictum in *Rosado, supra,* 397 U.S. at 421, 90 S.Ct. at 1222, has consistently assumed that it is a proper remedy, see *California Dep't of Human Resources v. Java,* 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971); *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); cf. *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), as have the lower federal courts, see, e.g., *Wilkinson, supra.* We regard the point as too well settled to be questioned by us, especially since the defendants do not question it either. The result, at least given *Rosado,* makes a certain amount of practical sense in a case like this; it is unlikely that faced with a choice (as in *Rosado* ) between forgoing federal money and modifying or even abandoning

section 602 B, a provision as we shall see of limited practical significance, Illinois would choose to forgo the money. Maybe that is why the defendants have not questioned the nature of the remedy that the plaintiffs are seeking.

The question we do have to decide, which is one of first impression, is whether Illinois' practice of postponing payment of benefits to applicants who are in legal custody or on bail for a work-related felony or theft, until the charges are resolved, is an administrative method "reasonably calculated to insure full payment of unemployment compensation when due," or as this is glossed in the regulations "with the greatest promptness that is administratively feasible." The state argues that section 303(a)(1) has no application to this case because benefits do not become due until the criminal charges are resolved; in its view the held in abeyance proviso postpones the determination of eligibility, rather than the payment of benefits to eligible persons.

This is not an absurd argument, although it has been rejected in related contexts, see *Fusari v. Steinberg,* 419 U.S. 379, 388 n. 15, 95 S.Ct. 533, 539 n. 15, 42 L.Ed.2d 521 (1975); *Wilkinson, supra,* 627 F.2d at 661 n. 14. But it would give section 303(a)(1) a very restricted scope, limiting it to cases, such as *Burtton v. Johnson,* 538 F.2d 765 (7th Cir. 1976), where the state concedes that unemployment compensation is due someone and simply fails to establish administrative mechanisms that result in paying him within a reasonable time. Under this view a state could take all the time in the world to decide that an unemployed person was entitled to compensation, provided that it got the check to him promptly when it did decide.

We think Congress had larger objects in view than the ministerial competence of state comptrollers. Both the humane (or redistributive) objectives of unemployment insurance and its macroeconomic objective (dampening the business cycle by keeping up the purchasing power of people laid off in a recession) require that unemployment compensation be paid as promptly as possible after the worker is laid off. Of course he must meet the state's eligibility criteria but if the state delays indefinitely in deciding whether he has met them it defeats the objectives behind requiring prompt payment. It is true that section 303(a) is in Title III of the Social Security Act, which provides for federal financing of just the administrative expenses of unemployment compensation. See 42 U.S.C. § 502. But it does not follow that the concern behind section 303(a) is limited to administrative efficiency in a narrow sense. In fact the legislative history suggests that the purpose of Title III in general and section 303(a) in particular was to furnish federal money for the administrative expenses of state unemployment compensation programs as an inducement to the states to adopt programs that would achieve the larger objects suggested above. See H.R.Rep. No. 615, 74th Cong., 1st Sess. 7, 9, 23 (1935).

█ Now we know that a large fraction of the people whose benefits are postponed under section 602 B of the Illinois Unemployment Insurance Act because they are in legal custody or on bail for a work-related felony or theft are in fact eligible from the day they became unemployed, because the district court found, and the defendants do not contest its finding, that 39 percent of the claimants whose benefits were postponed under section 602 B in 1979 (the only year for which there are data in the record) neither admitted their guilt nor were convicted of a work-related felony or theft. If Illinois had good reason to postpone the payment of benefits to these people, then, bearing in mind that the state has a legitimate interest in enforcing its valid eligibility criteria and minimizing its administrative expenses, we would not regard section 303(a)(1)—which only requires administrative methods "reasonably calculated" to ensure prompt payment—as a bar to postponement. But postponement must not be unreasonable.

█ We take a similar approach to whether the held in abeyance proviso must comply with the requirement in section 303(a)(3) of the Social Security Act of an

"opportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied." We do not read "denial" to mean "denial with finality." Since the federal statute desiderates prompt payment to eligible applicants, the denial of immediate benefits that occurs by operation of section 602 B when the applicant is placed in custody for a work-related crime or theft is denial enough to trigger the Social Security Act's requirement of a fair opportunity for a hearing. Otherwise, once again, the objectives behind the requirement of prompt payment could be defeated simply by the state's indefinitely deferring final action on applications for unemployment benefits. But it does not follow that the hearing must precede the provisional denial of benefits that the held in abeyance proviso brings about. Section 303(a)(3) does not specify the timing of the hearing. If the state can offer good reasons for deferring it, even till the criminal trial itself—which is "a fair hearing, before an impartial tribunal"—the section is not a roadblock. But deferral must be justified.

 So far as the issues in this case are concerned, then, sections 303(a)(1) and (3) merge. Each recognizes an interest both in prompt payment of unemployment compensation to eligible individuals and in keeping ineligible individuals from receiving compensation. The question is whether the held in abeyance procedure of section 602 B strikes a reasonable balance. We shall first ask how much the procedure burdens the interest in prompt payment to eligible individuals and then whether that burden is offset by the benefits of the procedure in keeping ineligible individuals from receiving compensation.

The answer to the first question is "a lot," and the essential fact that compels this answer has already been given: 39 percent of the applicants who incur postponement by virtue of the "held in abeyance" proviso are in fact eligible for unemployment compensation, yet because of the proviso experience delays in receiving compensation that are often substantial. The district court referred to the finding in an unpublished study, whose accuracy is not challenged by the defendants, that in 1979 the average interval between arrest and disposition of charges, for felony arrests in Cook County (Chicago and surrounding suburbs), was 448 days. There are unfortunately no comparable data for other counties in Illinois, for misdemeanor theft, or (a deficiency shared with the error-rate statistic presented earlier) for federal prosecutions.

The statistics we have presented are limited in scope and reliability, but probably are not far off the mark given the way in which the criminal justice system of Illinois, as of most states, operates. The held in abeyance proviso comes into play when an applicant is taken into legal custody and the proviso releases its grip only when the criminal charges against him are resolved. The usual way in which an individual is taken into custody is, of course, by arrest, based either on a magistrate's determination in a summary ex parte proceeding that there is probable cause to believe that he has committed a crime or, if the arrest is not pursuant to a warrant, on a determination of probable cause by the arresting officer. Mistakes are not uncommon at the arrest stage, see, e.g., *Johnson v. Miller*, 680 F.2d 39 (7th Cir. 1982), which is why the arrested individual has a right to be brought before a magistrate promptly for a preliminary hearing. But the question at that hearing is not whether it is more likely than not that the individual is guilty of the crime for which he was arrested, much less whether the state can prove his guilt beyond a reasonable doubt, but simply whether there is probable cause to believe him guilty of the crime. At the preliminary hearing the accused, if not discharged for lack of probable cause, is usually released on bail but that does not change his status under section 602 B—he still is not entitled to receive unemployment benefits. The next stage in a felony prosecution in Illinois is indictment by a grand jury, again an ex parte proceeding, where again the issue is probable cause. The next stage, and seemingly the last so far as section 602 B is concerned, is the trial itself.

The individual who goes through the whole process and is then acquitted may not receive the unemployment benefits to which he was in fact entitled from the outset until several years after he lost his job. But of course most people arrested for crimes do not stay the whole course. Charges can be dropped at any stage—because the complaining witness loses interest in the case (maybe criminal charges were brought just to coerce the defendant to make restitution, and the threat worked), or because the defendant convinces the prosecutor of his innocence, or because the prosecutor decides he does not have enough evidence to prove guilt beyond a reasonable doubt. Often the process is terminated by the defendant's pleading guilty to a lesser charge than the one on which his arrest was based. If the defendant was originally charged with a felony but is allowed to plead guilty to a misdemeanor other than theft, or was originally charged with misdemeanor theft but is allowed to plead guilty to some lesser misdemeanor, then he will be entitled, again retroactively, to unemployment benefits; and he may have had to wait months for the completion of the plea negotiations, and hence for that retroactive payment.

It is thus easy to see why a large fraction of individuals whose unemployment benefits are suspended under section 602 B turn out to have been eligible for those benefits all along. The cynic—or realist—will reply that probably most of them are guilty of the crime with which they were originally charged, and escaped conviction for that crime only because of the extraordinary concern displayed at every stage of the criminal process with avoiding conviction of an innocent person, a concern which enables many guilty people to escape the punishment they deserve. But this observation has no relevance to the validity of the held in abeyance proviso. Section 602 B does not disqualify people charged with crime, or guilty in fact of crime, but only people who admit or are convicted of having committed a crime. These distinctions have been emphasized by Illinois' own unemployment board of review. See 4 CCH Unemployment Ins.Rep. ¶ 1970 at p. 16,206.29 (1949).

And not any crime will do; it must be a felony or theft connected with the applicant's employment. The 39 percent who, having been initially caught in the toils of the criminal justice system, manage to escape conviction for these crimes are indeed eligible for unemployment benefits so far as section 602 B is concerned, even if most of them are not really paragons of virtue.

The criminal justice system of Illinois, used as a sieve to strain out those who probably are ineligible for benefits under the standards of section 602 B, turns out to have so tight and tough a mesh that it keeps out—and for long periods of time too—almost as many eligible as ineligible applicants. Yet crude as the procedure is, and lengthy as are the delays it imposes on the receipt of benefits to which claimants are lawfully entitled, it can be argued that these defects are cured by the fact that the state does in the end pay every applicant whose benefits are postponed under section 602 B, but who is not convicted of a section 602 B crime, the full benefits to which he was entitled from the date when he was laid off.

Now in many situations compensation would be a completely—or at least constitutionally—adequate remedy for an erroneous denial of benefits when due. But in the present situation the timing of compensation is as important as the amount. Someone fired because of alleged criminal conduct on the job is unlikely to have accumulated substantial assets to tide him over a period of unemployment, and what assets he has may become depleted fighting the criminal charges. The circumstances of his discharge, moreover, will make it difficult for him either to find other employment soon or to borrow against the prospect of future earnings. Of course if the misconduct for which he was fired was some tremendous theft he may be well fixed for money even if he is denied unemployment benefits. But the bigger the "take," the more likely it is that the employee—who by hypothesis has been caught—will be successfully prosecuted for theft and thus will never become eligible for those benefits.

Our concern is with the individual who is charged but not convicted, and while as we have said he may in fact have been guilty of criminal wrongdoing he is unlikely to have become greatly enriched by it. For him the prospect of receiving his full benefits retroactively if he escapes conviction for a work-related felony or theft will be small consolation for the denial of current benefits.

The consequences go beyond the hardship to the individual applicant. One of the original purposes of the federal unemployment insurance program was to reduce the severity of the business cycle by maintaining the purchasing power of people laid off during a recession. See H.R.Rep. No. 615, *supra,* at 8. This purpose is defeated when the payment of unemployment compensation is delayed till long after the date that the claimant lost his job. Of course the aggregate effects of section 602 B are trivial, even in Illinois. In 1979 fewer than a thousand people were affected by that provision, and fewer than 40 percent of them were eligible for compensation—less than one tenth of one percent of the total number of applicants for unemployment benefits in Illinois that year. But we cannot consider the consequences of section 602 B alone. Section 303(a) of the Social Security Act is general. If it is interpreted to allow long delays in paying compensation to groups that contain large fractions of eligible people, that interpretation potentially will affect not only section 602 B of the Illinois Unemployment Insurance Act but also all other provisions, both of the Illinois act and of the unemployment compensation statutes of the other 49 states, relating to determinations of eligibility. The aggregate effects could be large.

But we must consider the state's competing interest in enforcing its eligibility criteria, the validity of which is not questioned. We reject the facile suggestion that its interest is fully protected by its right to recover, with interest and reasonable penalties if it wishes to require them, unemployment compensation paid to an individual later convicted of a felony or theft in connection with his employment. The Illinois Unemployment Insurance Act has a recoupment provision. See Ill.Rev.Stat.1981, ch. 48, § 490. We do not know how frequently it is invoked, but we doubt that it would be of much practical value in the present context. Most of those who are unemployed because they have been charged with criminal activity in their last jobs are necessitous. Any unemployment benefits they receive will go to pay their current expenses rather than accumulate into a fund that the state can recapture through legal proceedings if it turns out that the benefits were paid by mistake. Once paid, they are gone; and the state has a substantial interest in not paying benefits to the 61 percent of those taken into custody for work-related felony or theft who are in fact ineligible for unemployment benefits.

The district court thought that the state could protect its interests by conducting administrative hearings before it invokes section 602 B to postpone the payment of benefits till the end of the criminal proceedings. Another method of protecting its interests should also be mentioned. Section 602 A of the Illinois Unemployment Insurance Act disqualifies applicants who lost their jobs through misconduct, whether or not the misconduct led to criminal or other legal proceedings. The disqualification is less complete than under section 602 B, as one would expect, since a criminal conviction is better evidence of serious misconduct than a finding merely that the applicant was discharged for cause. Under section 602 A, although the applicant is not entitled to unemployment benefits for the period of unemployment following his discharge, if he is reemployed for as little as a month and is then laid off he is eligible for unemployment benefits and can if he wants use his wage in his old job as the basis for computing the benefits to which he is entitled (which he will do, of course, if that wage was higher than the wage in his most recent job). Under section 602 B, to be entitled to unemployment benefits during some future layoff the applicant must requalify for unemployment compensation by working the full base period (one year) in a

new job, and the level of benefits for which he qualifies will be based on his earnings in that job; he cannot use his wage in the previous job in calculating the benefits to which he is entitled. Still, a finding of misconduct under section 602 A does protect to a great extent the state's interest in denying benefits to people convicted of a work-related crime—a class that is included within the much broader class of people fired for misconduct. *Granite City Steel Div. of Nat'l Steel Corp. v. Board of Review of Dept. of Labor,* 68 Ill.App.3d 264, 24 Ill.Dec. 790, 385 N.E.2d 931 (1979). In one important respect, indeed, it gives the state more protection. Less evidence is necessary to establish misconduct than to convict of crime, so that fewer guilty people slip through the mesh of 602 A than of 602 B.

But if the section 602 A procedure is such a good substitute for the section 602 B procedure, why, it may be asked, is the state fighting to retain the latter? The only apparent reason is that section 602 B enables the state unemployment insurance office to take a free ride on the state and federal criminal justice systems rather than having to rely on its own administrative procedures. Section 602 B in effect delegates to the criminal justice authorities the determination of eligibility for unemployment compensation, whereas under section 602 A the state's unemployment insurance office must conduct a hearing on whether the applicant was guilty of misconduct.

The cost saving is genuine. The state needs fewer hearing examiners and other administrative personnel and facilities than it would if it had to make its own independent determination that the applicant had committed a work-related felony or theft, or if, abandoning any effort to determine in advance whether an applicant was likely to be convicted of a crime encompassed by section 602 B, it brought all misconduct cases under section 602 A and later transferred applicants from the section 602 A to the section 602 B category if they were convicted of a 602 B crime. But the administrative cost savings seem too small to justify postponing indefinitely the payment of unemployment compensation to the large

eligible fraction of those affected by the postponement. It is a pity that the record does not contain more data on the relevant costs and benefits. We are not told how much another thousand hearings (and administrative appeals therefrom) per year would cost—not that there would be that many, since some claimants fired for felony or theft would not request a hearing, especially those most likely to be convicted of one of those crimes. In any event we doubt that we are talking about more than the salaries of two or three more claims adjudicators. We do not even know the aggregate dollar value of the benefits that are postponed each year under section 602 B, though we can make a fair guess that it is in the millions. Nor is it entirely clear how to go about measuring the private and social costs of delaying benefits that will eventually be paid in full, as distinct from the costs if they are withheld forever, in order to balance the costs of delay against the added administrative expense of eliminating delay. But the plaintiffs put in enough evidence of the unreasonableness of the held in abeyance procedure to shift to the state—which after all had, or could easily have obtained, all the necessary information on the costs of additional procedural safeguards and on the dollar value of the postponed benefits—the burden of producing contrary evidence; and the state produced none.

Having held that the postponement of unemployment benefits under section 602 B of the Illinois act is contrary to sections 303(a)(1) and (3) of the Social Security Act and therefore invalid under the supremacy clause, we turn to the question of remedy. The district court required the state to offer the same administrative procedures (hearing, multi-tiered review, etc.) to people whose benefits it wants to postpone under section 602 B as it offers to people whose benefits are denied under section 602 A or other eligibility provisions of the Illinois act. This remedy overlooks a latent issue of federalism. Although the nominal defendants in this case are state officers, the real defendant, of course, is the

State of Illinois itself. When formulating equitable remedies against a state—an entity still to be regarded as having some sovereign dignity—a federal court should try to minimize their abrasive potential. It should presume that the state will attempt to comply in good faith with the letter and spirit of its ruling. Events may rebut the presumption in particular cases but there is no suggestion that once the judgment invalidating the held in abeyance procedure of section 602 B becomes final the State of Illinois will try to evade it. If the state does try, the federal courts have all the powers they need, including the power to issue mandatory injunctions as detailed and specific as the situation requires, backed up by all the force of the United States, to make their decisions effective. But it is premature to administer any of this strong medicine to the State of Illinois.

██ We believe, therefore, that the state should be permitted to decide, in the first instance, how the held in abeyance proviso of section 602 B can be altered to comply with section 303(a) of the Social Security Act. The state may not simply take a free ride on the criminal justice system as it has been doing, but it does not follow that it may make no use whatever of the determinations made in that system (short of the final determination of conviction, which all agree it can properly use). For example, if there has been a full preliminary hearing on the criminal charge, the state might propose to use the transcript of that hearing to satisfy its burden of producing evidence that the applicant had committed a work-related felony or theft, and thereby shift to the applicant the burden of producing some contrary evidence. We do not say that the state must use this procedure, or even that if it does it will comply with section 303(a). We say that it is premature to decide that the only method of compliance is for the state to offer people in custody or out on bail for 602 B crimes the identical administrative hearing that it provides section 602 A applicants or others whose claims for compensation are initially denied. Nor are we even willing to go so far as to hold that the provision of such a hearing would necessarily comply with the federal act. The only pertinent disqualification in section 602 B is for people who are convicted of certain crimes, and the fact that a person is found in an administrative hearing where the burden of persuasion is a preponderance of the evidence rather than proof beyond a reasonable doubt to have committed a crime may turn out to be a poor predictor of the outcome of the criminal proceedings against him. The goal of the decree in this case should be a procedure that will substantially reduce the 40 percent error rate and 448-day average delay of the current procedure. It is too early to decide what the new procedure should be, or even whether an adequate one exists. Maybe in the end the state will have to abandon section 602 B altogether and rely entirely on section 602 A, which as we have pointed out is a pretty good substitute that has none of the problems that have led us to invalidate the held in abeyance provision of section 602 B.

On remand the district court should enter a judgment that enjoins the state from enforcing the held in abeyance proviso as currently written and enforced but that does not specify the exact measures that the state must take to bring itself into compliance with the law. But the court should retain jurisdiction of the case so that if the state adopts some measure that the plaintiffs believe is inconsistent with our ruling they can ask the court for supplementary relief. In considering such requests if and when made, we trust the court will allow the state a reasonable opportunity to demonstrate, statistically or otherwise, that the measures it takes to comply with the judgment have been successful in eliminating the inordinate error rate and indefinite delays that have persuaded us that section 602 B as currently administered is invalid.

██ A few loose ends remain to be tied up, and we are done. First, we find it unnecessary to decide whether the held in abeyance proviso violates the due process clause of the Fourteenth Amendment by denying unemployment claimants a fair

hearing. Presumably the statutory requirement for a fair hearing is not less exacting than the constitutional one, so whatever remedy puts the defendants in compliance with section 303(a)(3) should equally or more certainly put them in compliance with the due process clause. But we do point out that the district court's suggestion that the held in abeyance proviso violates a "presumption of innocence" found in the due process clause is clearly wrong, see *Bell v. Wolfish,* 441 U.S. 520, 532–33, 99 S.Ct. 1861, 1870, 60 L.Ed.2d 447 (1979), and was properly abandoned by the plaintiffs in their appeal to this court.

We also express no opinion on the district court's discussion of the bearing of the self-incrimination clause of the Fifth Amendment, as applied to the states through the due process clause, on the question of how to prove in administrative proceedings that an applicant for unemployment insurance has committed a work-related felony or theft. The district court forbade the state to use a claimant's silence as evidence that he was guilty of the crime, and to postpone his benefits accordingly. The propriety of using an inference of guilt from silence to deny a benefit is a difficult issue (on which cf. *Blumenthal v. FCC,* 115 U.S.App.D.C. 305, 318 F.2d 276 (1963); *Clifford v. Shoultz,* 413 F.2d 868, 876 (9th Cir. 1969)) that we need not decide yet but that the state should consider in the first instance in designing procedures to comply with the judgment that the district court will enter on remand.

Neither do we express any view on the quaint inclusion in the held in abeyance proviso of "fugitive[s] from justice" along with people who are in legal custody or on bail. None of the members of the plaintiff class is a fugitive from justice. It would be an audacious fugitive who asked to receive unemployment compensation while a fugitive and an even more audacious one who demanded a hearing to decide whether he had committed the crime for which he had fled the jurisdiction. In any event, his case is not before us and we express no opinion concerning his rights, if any, under section 303(a).

We note, finally, that the state has not appealed from the part of the judgment relating to its failure to give adequate notice to people whose benefits are delayed under section 602 B (notice as to why they are not getting benefits and notice that the criminal charges have been resolved against them, when that happens) and awarding benefits to certain named members of the class. Nothing we say today is meant to disturb the unappealed portion of the judgment. Subject to this qualification the judgment of the district court is vacated and the case remanded for further proceedings consistent with this opinion. The parties shall bear their own costs in this court.

So Ordered.