**Luella PENNINGTON, individually and on behalf of other similarly situated persons, Plaintiffs–Appellants,**

**v.**

**Loleta DIDRICKSON,\* Director of the Illinois Department of Employment Security, Defendant–Appellee.**

No. 92–3725.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1993.

Decided April 11, 1994.

As Clarified May 27, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied May 31, 1994.

---

\* During the pendency of this case, Loleta Didrickson succeeded Sally Ward as Director of the Illinois Department of Employment Security.

Director Didrickson has been substituted for her predecessor pursuant to Federal Rule of Appellate Procedure 43(c)(1).

Nelson A. Brown, Jr., Jeffrey B. Gilbert (argued), Legal Assistance Foundation of Chicago, Lauren B. Simon, Office of Corp. Counsel, Chicago, IL, for Luella Pennington.

Deborah L. Ahlstrand, Asst. Atty. Gen., Chicago, IL (argued), for Loleta Didrickson.

Before ESCHBACH, RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiffs are a certified class of unemployment insurance claimants who brought action under 42 U.S.C. § 1983 against the Illinois Department of Employment Security ("IDES"). The plaintiff class challenges the definition of "base period" in section 237 of the Illinois Unemployment Insurance Act (the "IUIA"), 820 ILCS 405 /237. It maintains that the definition violates the "when due" clause of section 303(a)(1) of the Social Security Act (the "SSA"), 42 U.S.C. § 503(a)(1). Following a bench trial, the district court entered judgment for IDES. For the reasons that follow, we reverse and remand the case to the district court.

## I

## BACKGROUND

### A. *Statutory Scheme*

Although unemployment insurance is administered at the state level, the SSA makes federal funds available to the states to encourage them to enact unemployment insurance laws. However, before the federal government will provide funds for a state to administer its unemployment insurance programs, the Secretary of Labor must certify that a recipient state's program meets certain statutory requirements. *See* 42 U.S.C. §§ 502, 503(b)(2), 504. One of those requirements is the "when due" clause of section 303(a)(1) of the SSA; it requires a state's unemployment insurance laws to provide for "such methods of administration . . . as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due." 42 U.S.C. § 503(a)(1). Department of Labor regulations state that the "when due" clause requires a state to provide for such "methods of administration as will reasonably insure the full payment of unemployment benefits to eligible claimants with the greatest promptness that is administratively feasible." 20 C.F.R. § 640.3(a). Although "[f]ederal laws provide no authority for the Secretary of Labor to determine the eligibility of individuals under a State law," the regulations make clear that "implicit in prompt performance with respect to benefit payments is the corresponding need for promptness by the State in making determinations of eligibility." 20 C.F.R. § 640.1(a)(2).

In Illinois, an eligible unemployment insurance claimant can draw benefits in "the one-year period beginning with the first day of the week with respect to which the individual first files a valid claim for benefits." 820 ILCS 405/242. This is known as a claimant's "benefit year." *Id.* However, in order to file a "valid claim" for unemployment insurance, a claimant must have earned sufficient wages during the claimant's "base period." [1] Section 237 of the IUIA defines a "base period" as "the first four of the last five completed calendar quarters immediately preceding the benefit year." 820 ILCS 405/237. Thus, section 237's base period excludes the wages a claimant earns in the quarter immediately preceding the quarter in which a claimant files (the fifth quarter, or the "lag quarter") and excludes the wages a claimant earns in the quarter in which the claimant files (the sixth quarter, or the "filing quarter"). For example, for a claimant who filed for benefits in June 1993 (the second calendar quarter of 1993), the resulting base period would have been the four calendar quarters of 1992; the first quarter of 1993 would have been the claimant's lag quarter, and the second quarter of 1993 would have been the claimant's filing quarter. Pursuant to section 237's base period, IDES would consider only the wages the claimant earned in the four calendar quarters of 1992 in determining the claimant's eligibility for unemployment insurance. [2]

Illinois uses its base period scheme because it is a "wage record system" state. Under this system, employers covered by the IUIA report the gross wages of all their employees to the state unemployment securi-

---

1. Under section 500 E of the IUIA, a claimant must have earned at least $1,600 in the entire "base period" and must have earned at least $440 of that $1,600 outside the calendar quarter in which the claimant's wages were the highest. 820 ILCS 405/500 E. For example, if a claimant earned $1,600 over the four calendar quarters that constituted that claimant's base period, the claimant must not have earned any more than

$1,160 in any one quarter. Otherwise, the claimant would not have satisfied section 500 E's requirement that at least $440 be earned outside the calendar quarter in which the claimant earned the most wages.

2. To illustrate, the following represents the base period of a claimant who filed for unemployment insurance in June 1993:

1st Quarter (Jan.–Mar.1992) . . . . . . . . . . . . . . . .earnings considered
2nd Quarter (Apr.–June 1992) . . . . . . . . . . . . . .earnings considered
3rd Quarter (July–Sept. 1992). . . . . . . . . . . . . . .earnings considered
4th Quarter (Oct.–Dec. 1992) . . . . . . . . . . . . . . .earnings considered
5th Quarter (Jan.–Mar.1993) . . . . . . . . . . . . . . .earnings not considered (lag quarter)
6th Quarter (Apr.–June 1993) . . . . . . . . . . . . . . .earnings not considered (filing quarter)

ty agency on a quarterly basis. Employers must report their employees' wages by the last day of the month following the quarter in which the wages were paid. As a result, IDES experiences peak periods that begin about one week prior to the end of the reporting month; the peak periods last about 3 to 8 weeks with an additional week to process delinquent reports. App. VII at 70–71 (Stipulated Facts). The gap created by the base period in section 237 of the IUIA (i.e., the gap between the end of a claimant's base period and the beginning of a claimant's benefit year) gives employers in a wage record system time to report wage information to the state agency and gives the state agency time to make that information available to local unemployment insurance offices. App. VII at 66–67.

Although a wage record system is the most common system in the United States, some states use a "wage request system," under which a state requests a claimant's wage information from the claimant's employer when the claimant files for unemployment benefits. Because a state agency under this system handles only wage information needed to adjudicate each particular claim, a state agency can request the most recent wage information for each claimant, thereby obviating the need for a substantial gap between the end of a claimant's base period and the beginning of a claimant's benefit year. App. VII at 67–68. Finally, some states move their base periods. Under this approach, when a claimant has insufficient qualifying wages in the first four of the last five completed quarters under an IUIA section 237–type base period, the state agency redetermines the claim based on wages earned in the four completed calendar quarters immediately preceding the filing quarter. App. VII at 68.

### B. *Luella Pennington*

Luella Pennington is the class representative for the unemployment insurance claimants. She filed a claim with IDES for unemployment insurance on June 7, 1984, the second quarter of 1984. Under IUIA section 237, Ms. Pennington's base period was January 1, 1983 to December 31, 1983, the four calendar quarters of 1983. Because Ms.

Pennington had not earned sufficient qualifying wages in her section 237 base period, IDES denied her application. Ms. Pennington remained unemployed and therefore filed a second claim on October 5, 1984, the fourth quarter of 1984. Her base period for this application encompassed the third and fourth quarters of 1983, and the first and second quarters of 1984. She was entitled to benefits this time because she had earned enough section 500 E qualifying wages in the first two quarters of 1984.

Section 237's base period required Ms. Pennington to wait until October 5, 1984 to claim benefits. If IDES had considered lag quarters in determining qualifying wages, Ms. Pennington could have successfully refiled on July 2, 1984, the third quarter of 1984, because IDES would have considered the first two quarters of 1984 in determining her qualifying wages. Instead, she had to wait to file in October 1984, the fourth quarter of 1984, in order to have both the first and second quarters of 1984 considered as qualifying wages under the section 237 base period. Ms. Pennington therefore brought a § 1983 action against IDES on behalf of herself and all others similarly situated alleging that section 237's base period violates the "when due" clause of the SSA. The plaintiff class's first complaint alleged that it was "administratively feasible," 20 C.F.R. § 640.-3(a), for IDES to include as the four-quarter base period both the lag quarter and, if necessary, the filing quarter. The class's second amended complaint, however, alleges only that it would be administratively feasible for IDES to consider the lag quarter in calculating a claimant's qualifying wages, thus making the base period the four calendar quarters immediately preceding the filing quarter.

### C. *District Court Proceedings*

IDES moved to dismiss the plaintiff class's complaint and moved for summary judgment. One of IDES's main arguments was that section 237 is not an administrative method subject to the "when due" clause, but rather is an eligibility provision, which Congress left the states to determine. Section 237, IDES submitted, is a monetary eligibility provision which defines the class of claimants to whom payments are due. Because Ms. Pennington

and the plaintiff class had insufficient qualifying wages under section 237, they were not "due" anything. IDES thus claimed that the "when due" provision was inapplicable because it applies only after a claimant has been deemed eligible for benefits under state law. The district court denied IDES's motions, as well as its motion to reconsider. In its June 13, 1989 Memorandum Opinion and Order, the court relied on *Jenkins v. Bowling*, 691 F.2d 1225 (7th Cir.1982), and stated that the "when due" clause requires prompt determination of eligibility as well as prompt payment of benefits to eligible claimants. June 13, 1989 Mem.Op. at 7–8.

The case proceeded to a bench trial in October 1990. Although the parties stipulated to many facts, procedures, and issues, each side presented evidence concerning the "administrative feasibility" of implementing an alternative base period definition.[3] In an October 21, 1992 Memorandum Opinion and Order, issued two years after the bench trial, the district court handed down its judgment

---

3. The plaintiff class's expert witness, Peter Kauffman, conceded that, based on the speed of claim processing, the control of fraud, and the cost of administration, the wage record system which IDES currently uses is a better method than the wage request system. However, Kauffman testified that there existed an administratively feasible method, which he termed "Alternative I," by which IDES could minimize the delay caused by section 237's base period. The heart of Alternative I consists of using a movable base period on a limited basis. Whenever a claimant lacked sufficient qualifying wages in the section 237 base period, IDES could make a determination of a claimant's qualifying wages based on the wages a claimant earned in the lag quarter. Thus, Alternative I's base period for claimants with insufficient wages in the section 237 base period would be a moved base period comprised of the four calendar quarters immediately preceding the filing quarter (i.e., the second, third, and fourth quarters of the section 237 base period plus the lag quarter).

Because employers need report their employees' wages only by the last day of the month following the quarter in which the wages were paid, a claimant's lag quarter wages will not always be posted in the first few weeks of the claimant's filing quarter. (Kauffman's study found that 16% of a completed quarter's wage data is processed and available by the end of the fourth week of the following quarter; 73% is available at the end of the eighth week.) Under Alternative I, therefore, when a claimant files who does not have sufficient qualifying wages in the claimant's section 237 base period, IDES first would run a "threshold" test using the wage information from the second, third, and fourth quarters of the section 237 base period. If the claimant had not earned at least $440 in those three quarters, the claimant would be ineligible by statute for benefits regardless how much the claimant earned in the lag quarter. *See supra* note 1 (discussing monetary eligibility requirements of IUIA section 500 E). According to Kauffman, this threshold test would eliminate two-thirds of those without qualifying wages under section 237 from further consideration. If a claimant's lag quarter wages were not processed and available, and that claimant passed the section 500 E threshold test, IDES's computer would issue a monetary finding as soon as the lag quarter wages were posted. Of course, for those claimants whose lag quarter wages were posted when they filed their claim and who did not have sufficient qualifying wages under section 237, IDES's computer would issue a second finding of eligibility on the basis of the movable base period comprised of the four completed calendar quarters preceding the filing quarter. Under Alternative I, those claimants who had sufficient qualifying wages in the four quarters preceding the filing quarter would receive unemployment insurance benefits retroactive to their initial claim.

Kauffman also set out in his testimony two other possible methods. "Alternative II" would consist of speeding administration of Alternative I by sending wage requests to employers of claimants who applied in the first month of the filing quarter, whose lag quarter wages were not posted at application time, and who passed the threshold test. "Alternative III" would do the same for all such claimants, not just those who applied in the first month of the filing quarter. Kauffman testified that the marginal expense of these two alternatives, in comparison with Alternative I, exceeded their marginal benefits.

Both the plaintiff class and IDES presented evidence on the costs of implementing the movable base period of Kauffman's Alternative I. Kauffman testified that only one additional IDES staff person would be necessary to execute Alternative I. In addition, Kauffman stated that one-time computer conversion costs would be $50,000 for equipment and $40,000 for one computer programmer's compensation. IDES's expert witness, on the other hand, Michael Marshman, estimated that the cost of computer conversion under Alternative I would run approximately $2 million. Melissa Barton, manager of IDES's computer, estimated that computer conversion would run about $1.7 million and that IDES would need to employ three or four additional programmers.

Finally, both sides stipulated that, in 1986, 526,469 claimants filed unemployment benefits applications with IDES. IDES denied 63,518 claimants benefits because they lacked qualifying

in favor of IDES. However, instead of assessing the evidence at trial and making express findings of fact on the issue of administrative feasibility, the district court reversed its earlier decisions and ruled that section 237 was an eligibility requirement. As such, the district court held that IDES was entitled to judgment as a matter of law. The court reasoned that claimants who do not have sufficient qualifying wages under section 237's base period, but who would if lag quarter wages were included in IDES's determination, do not experience any "delay" in receiving benefits because those benefits are not "due." Mem.Op. at 12. Rather, such claimants are "simply ineligible" for benefits at the time they apply. Mem.Op. at 11. Thus, according to the district court, section 237 is not an administrative method subject to the "when due" clause of section 303(a)(1) of the SSA, but rather a "valid eligibility" provision, the content of which Congress has left to the states. The district court, however, did not end its discussion at that point. Although it had already held as a matter of law that section 237 was not subject to the "when due" clause, the district court proceeded to make a brief determination of whether the delay section 237's base period creates is justifiable under the "when due" clause. The court stated that, because section 237's base period did not create an "infinite delay," *Jenkins v. Bowling*, 691 F.2d 1225, 1229 (7th Cir.1982), section 237 did not violate the "when due" clause or any corresponding regulations. Oct. 21, 1992 Mem.Op. at 15.

## II

## ANALYSIS

On appeal, we must determine de novo whether the definition of base period in IUIA

section 237 is an administrative method subject to the "when due" clause of the SSA and its corresponding regulations, or whether it is an eligibility provision and thus beyond the reach of the "when due" clause.[4] If we determine that section 237's base period is an administrative method, we must weigh the burdens and benefits of section 237 against the burdens and benefits of the plaintiff class's proposed movable base period to determine whether section 237 "reasonably insure[s] the full payment of unemployment benefits to eligible claimants with the greatest promptness that is administratively feasible." 20 C.F.R. § 640.3(a).

### A. *Section 237: Eligibility Provision or Administrative Method?*

#### 1.

■ At the outset, we must address an initial argument of IDES, and of the Secretary of Labor as amicus curiae in support of IDES. IDES submits that, because a federal court lacks the authority to rewrite a state statute such as IUIA in granting an injunctive remedy, we therefore cannot grant relief to the plaintiff class in this case. IDES acknowledges that a federal court can enjoin the practice or use of a state statutory provision that violates the "when due" clause. *See, e.g., California Dep't of Human Res. Dev. v. Java*, 402 U.S. 121, 135, 91 S.Ct. 1347, 1356, 28 L.Ed.2d 666 (1971) (enjoining California statute which provided for the withholding of insurance benefits upon an employer's appeal from the initial eligibility determination because it violated the "when due" clause). However, IDES argues that the plaintiff class's suit seeking to enjoin

---

wages; however, 15,034 of those denied would have had sufficient qualifying wages if IDES had counted the wages they had earned in the lag quarter, as would be the case under the plaintiff class's Alternative I. Moreover, an additional 9,115 claimants would not have been denied benefits in 1986 if section 237's base period included the wages they had earned in their filing quarters. Under Alternative I, which includes lag quarter wages, these claimants could have filed a valid claim for benefits three months sooner than under the section 237 base period. *See* App. VII at 66 (Stipulated Facts).

4. The plaintiff class concedes that valid state eligibility requirements, such as "voluntary leaving," 820 ILCS 405/601; are not subject to the SSA's "when due" clause. Appellants' Br. at 25 ("[A] state does not violate the 'when due' clause by delaying payment of benefits to enforce provisions that govern eligibility.") (citing 20 C.F.R. § 640.1(a)(2) (stating that "applicable federal laws provide no authority for the Secretary of Labor to determine the eligibility of individuals under a State law")); *see also Jenkins*, 691 F.2d at 1229 (stating that "the state has a legitimate interest in enforcing its valid eligibility criteria").

IUIA section 237 as applied to the class should be dismissed because the relief the class seeks cannot be effected by merely enjoining section 237. Rather, IDES states that, because section 237 would remain in effect for the great majority of unemployment insurance claimants, the only remedy that would give the plaintiff class relief is the ordering of a special alternative base period. Such equitable relief, IDES contends, is an inappropriate remedy to impose on a sovereign state. *Cf. Jenkins,* 691 F.2d at 1234 (ordering the district court to enjoin the IUIA provision at issue but to do so in a judgment that "does not specify the exact measures that the state must take to bring itself into compliance with the law").

We cannot accept this argument. Although it is doubtless true that a federal court lacks the authority to rewrite IUIA section 237 for the Illinois General Assembly, relief can be granted to the plaintiff class in this case without doing so. Although the plaintiff class has tendered an alternative base period system, the remedial options open to the district court are not limited to entering an injunction ordering IDES to implement that alternative base period. Indeed, the plaintiff class does not even urge that such relief be granted. Rather, the proposed alternative base period is merely the plaintiff class's illustration that section 237's base period, as applied to the plaintiff class, violates the timeliness directive of the "when due" clause because a more prompt method of determining qualifying wages is administratively feasible. Thus, if it is determined that section 237 is an administrative provision and not an eligibility requirement, and if it is determined that there exists an administratively feasible alternative method by which to determine qualifying wages more promptly, the appropriate remedy will consist only of enjoining section 237 as applied to the plaintiff class. Because "the state should be permitted to decide, in the first instance, how [section 237] can be altered to comply with section 303(a) of the Social Security Act," it would be in the hands of the state to implement "the exact measures that the state must take to bring itself into compliance with the law." *Id.*

2.

The Secretary of Labor, appearing in this court as amicus curiae, notes at the outset of his presentation that it is clear that Congress intended that the states have "free rein" in designing the eligibility criteria for their respective unemployment programs. This statement is undoubtedly true. *See New York Tel. Co. v. New York State Dep't of Labor,* 440 U.S. 519, 539, 99 S.Ct. 1328, 1340, 59 L.Ed.2d 553 (1979) (plurality opinion) (stating that "Congress has been sensitive to the importance of the States' interest in fashioning their own unemployment compensation programs and especially their own eligibility criteria"); *Jenkins,* 691 F.2d at 1232 (acknowledging "the state's competing interest in enforcing its eligibility criteria, the validity of which is not questioned"). Nevertheless, this truism simply begs the question and, consequently, contributes nothing to the inquiry before us. Rather, we must address an antecedent issue—whether IUIA section 237 is an eligibility requirement rather than an administrative matter subject to the "when due" clause.

The Secretary argues that, because Congress noted the existence of lag periods while attempting to remedy the problem of so-called "double dipping," we ought to conclude that Congress determined that such periods are indeed acceptable. *Cf. Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 845–46, 106 S.Ct. 3245, 3253–54, 92 L.Ed.2d 675 (1986) ("It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'") (citation omitted). We do not believe that it is appropriate to read such a determination into Congress' selection of another remedy for that problem. Congress' decision to deal with the so-called "double dipping" problem by requiring intervening work rather than abolishing lag periods cannot fairly be characterized as a focused congressional examination of the problem before us in this litigation. Consequently, that decision does not counsel us to con-

clude that Congress has revisited this area and declined consciously to address the problem that the litigants are now addressing in this litigation. Indeed, the provision upon which the Secretary relies amended the Federal Unemployment Tax Act, 26 U.S.C. §§ 3301 *et seq.* The legislation had nothing to do with the operation of the "when due" clause and certainly did not address the issue of whether the type of base periods used in the Illinois statute violated that clause. When there is no indication that Congress has focused on the matter, legislative silence is indeed a very poor guide to the discernment of legislative intent. *Zuber v. Allen,* 396 U.S. 168, 185 n. 21, 90 S.Ct. 314, 324 n. 21, 24 L.Ed.2d 345 (1969).

The Secretary also reminds us that we are obliged to defer to the interpretation given a statute by the agency charged with the responsibility for administering it so long as the agency's interpretation of the statute is based upon a permissible reading of that statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *accord National R.R. Passenger Corp. v. Boston & Maine Corp.,* — U.S. —, —, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992). Our cases certainly demonstrate loyal adherence to that principle. *See, e.g., Hanson v. Espy,* 8 F.3d 469, 472–73 (7th Cir.1993); *United States v. Baxter Health Care Corp.,* 901 F.2d 1401, 1407 (7th Cir. 1990); *Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 906–07 (7th Cir.1990). Nevertheless, we have never interpreted this principle as a direction to approach our review of all government positions with a rubber stamp. For instance, along with the other circuits, we have distinguished between agency positions developed in the heat of litigation and those that reflect the deliberate attempt of the agency to implement the will of Congress through the regulatory process. *See, e.g., Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers,* 3 F.3d 994, 1003 (7th Cir.1993) (declining to defer to agency's amicus brief when the agency had not issued any regulation or opinion on the subject because

"[c]ourts do not defer to 'agency litigating positions that are wholly unsupported by regulations, rulings or administrative practice'") (quoting *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988)), *cert. granted in part,* — U.S. —, 114 S.Ct. 2736, — L.Ed.2d — (1994). Similarly, we have distinguished between those statements of legislative intent that the agency embodies in formal regulations[5] and that, consequently, have the benefit of careful crafting and comment, and those more informal statements that do not necessarily reflect the deliberate focus of the entire agency on the issue of congressional intent. *See, e.g., Doe v. Reivitz,* 830 F.2d 1441, 1446–47 (7th Cir.1987) (stating that interpretive documents "are not entitled to the same degree of deference commanded by the high-powered regulations reviewed in *Chevron*"), *amended,* 842 F.2d 194 (7th Cir.1988); *see also Hanson,* 8 F.3d at 472 n. 3 (7th Cir.1993) (noting same); *Metropolitan School Dist. v. Davila,* 969 F.2d 485, 490 (7th Cir.1992) (same), *cert. denied,* — U.S. —, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993).

We are mindful of our obligation to defer to the interpretation of the agency whenever that interpretation can be said to embody a deliberate and considered interpretation of the legislative intent. We therefore have examined with great care the sources that, in the agency's view, evidence its longstanding view that issues of lag periods are matters of eligibility and therefore are not subject to the "when due" clause and, indeed, are within the exclusive responsibility of the states. At the outset, we think it is important to note that the Secretary does not invite our attention to any instance in which, by formal regulation, the agency has squarely stated that the length of lag periods is a matter of eligibility within the exclusive authority of the states. Certainly, the simple definitional section for "base period" defines that period as "the period as determined under the applicable state law for the individual's applicable benefit year." 20 C.F.R. § 615.2(b). But this definition hardly qualifies as an explicit

---

**5.** *See Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n.9, 53 L.Ed.2d 448 (1977) (noting that regulations issued by an agency un-der statutory authority have the force and effect of law).

determination by the Secretary that lengthy lag periods are beyond the scope of the "when due" clause.

■ The Secretary also submits that the position of the agency can be discerned from certain "draft bills" provided to the states at the time of the initial enactment of the legislation in 1937 and again in 1950. In support of its position, the agency stresses that these "drafts" were merely advisory in nature and that the accompanying explanation explicitly recognized that it was the right and the responsibility of the states to decide "what kind of legislation it desires and how it shall be drafted." We recognize that particular deference is due to an agency pronouncement that "'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently, and smoothly while they are yet untried and new.'" *Power Reactor Co. v. Electricians*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) (citation omitted); *see also Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). In the case before us, however, it must be admitted that the "pronouncements" at issue are, to put it mildly, ambiguous evidence of the Secretary's interpretation. Although one of the drafts does include a lag period like the one in the present Illinois statute, by the Secretary's own admission, these "draft bills" were advisory in nature and hardly can be accorded the same weight as that given the formal regulations of the department. *See Ohio Bureau of Employment Serv. v. Hodory*, 431 U.S. 471, 485, 97 S.Ct. 1898, 1907, 52 L.Ed.2d 513 (1977) (declining "to read implications of the draft bills into the Social Security Act").

These "draft bills" do not, moreover, directly address the issue here: whether the lag period arrangement can be termed a matter of eligibility as opposed to a matter of

administration.[6] We are asked to imply that the general statement—that the state has the right to decide the contours of its own legislation—establishes that the agency regards the lag period as a matter of eligibility rather than an administrative matter. It must be remembered, however, that the states also have a great deal of latitude with respect to administrative matters, although that discretion is cabined somewhat by the strictures of the "when due" clause. One must read a great deal into the "draft bills" to determine that such a statement is a short hand for a definitive agency determination that the lag period issue is not subject to the "when due" clause.

An additional ambiguity in the Secretary's position must also be noted. If the matter of the lag periods is beyond the scope of the "when due" clause and therefore not a matter within the responsibility of the Secretary, it is difficult to understand why the agency found it necessary to devote such a great deal of effort to a matter not within its cognizance. As we have noted, the matter of lag times is addressed in the "draft bills." Again, in a 1962 policy statement, the agency addressed the matter and counseled the states agencies that lag periods ought to be as short as possible. While these agency utterances do not establish that the agency has treated lag periods as a matter of administration, they certainly cast a great deal of doubt on the proposition that the agency has taken the opposite position and consistently has treated the device as a matter of eligibility, the sole concern of the state. Absent definitive guidance from the Secretary, we must rely more heavily on the caselaw which has dealt with the issue, to which we now turn.

■ The plaintiff class submits that several cases demonstrate section 237 to be an administrative provision. In *Fusari v. Stein-*

---

**6.** The Secretary has made use of the draft bills to demonstrate that a lag period such as IUIA section 237 is an eligibility provision and not an administrative method. However, we also note that, if such a lag period is an administrative method and not an eligibility provision, the mere fact that the draft bills take notice of a lag period similar to IUIA section 237 does not indicate that that lag period is in compliance with the "when

due" clause or the corresponding regulations. A state must pay unemployment benefits "with the greatest promptness that is administratively feasible." 29 C.F.R. § 640.3(a). Needless to say, what was "administratively feasible" when the draft bills were written—1937, 1950, and 1962— is much different from what is administratively feasible in today's technologically advanced world.

*berg,* 419 U.S. 379, 388 n. 15, 95 S.Ct. 533, 539 n. 15, 42 L.Ed.2d 521 (1975), a district court had interpreted a prior Supreme Court summary affirmance in *Torres v. New York Department of Labor,* 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972), as standing for the proposition that "benefits are not 'due' under § 303 until administratively deemed payable." The Supreme Court stated that such an interpretation of the "when due" clause "would nullify the congressional intention of requiring prompt administrative provision of unemployment benefits." *Fusari,* 419 U.S. at 388 n. 15, 95 S.Ct. at 539 n. 15; *see also Wilkinson v. Abrams,* 627 F.2d 650, 661 n. 14 (3d Cir.1980) ("We find no merit in the Secretary's argument that the 'when due' requirement of § 303(a)(1) ... does not apply until a claimant has first been administratively determined to be eligible for unemployment compensation benefits.").

The plaintiff class also relies on our decision in *Jenkins,* 691 F.2d at 1229, in which we relied on *Fusari* in rejecting the same argument IDES presents in this case, albeit in the context of a different section of the IUIA. The proviso at issue in *Jenkins,* concerned eligibility decisions for unemployment insurance claimants who had allegedly been discharged because of a felony or theft in connection with the claimant's work. *Id.* at 1227. The proviso, IUIA section 602 B, stated that "the determination of [the affected claimant's] benefit rights shall be held in abeyance pending the result of any legal proceedings arising therefrom." *Id.* IDES argued that the "when due" clause did not apply to that proviso

> because benefits do not become due until the criminal charges are resolved; in [IDES's] view the held in abeyance proviso postpones the determination of eligibility, rather than the payment of benefits to eligible persons.

*Id.* at 1229. We rejected IDES's argument. We stated that it would unduly limit the "when due" clause to narrow issues of payment mechanisms, thereby precluding the use of the clause as a means of effectuating the purposes of the SSA (i.e., prompt determination and payment of unemployment insurance to achieve "humane" and "macroeco-

nomic" objectives). *Id.* The plaintiff class thus submits that *Jenkins* demonstrates that the "when due" clause requires prompt eligibility determinations, not just prompt payment of benefits. *See id.* ("We think Congress had larger objects in view than the ministerial competence of state comptrollers."). Moreover, the class asserts that *Jenkins* shows that IDES cannot make an end-run around a functional analysis of section 237 merely by labelling it an eligibility provision. Rather, section 237's purposes must be studied to determine whether it is subject to the "when due" clause.

The plaintiff class notes that, according to the Supreme Court, valid eligibility criteria "define the class of persons eligible for benefits." *Ohio Bureau of Employment Serv. v. Hodory,* 431 U.S. 471, 486–87, 97 S.Ct. 1898, 1907, 52 L.Ed.2d 513 (1977). By contrast, the class maintains that section 237's base period does not define the class of eligible claimants. Instead of determining *what* earnings IDES will consider, section 237 determines *when* IDES will count those earnings as qualifying wages. This is demonstrated, the class asserts, by the fact that a claimant not yet eligible for benefits owing to section 237's lag quarter need only wait to become eligible in the future. By contrast, a claimant ineligible under a valid eligibility criterion, such as the IUIA "voluntary leaving" provision, must affirmatively rectify the situation by, in this example for instance, "becom[ing] reemployed and ha[ving] had earnings equal to or in excess of his weekly benefit amount in each of four calendar weeks." 820 ILCS 405/601. Finally, the plaintiff class states that both sides agree that valid eligibility criteria measure a claimant's "continued and current attachment to the labor force." *Fleiszig v. Board of Review,* 412 Ill. 49, 104 N.E.2d 818, 821 (1952). However, the class submits that section 237's base period causes class members with relatively strong attachment to the work force to wait until that attachment has weakened before they can receive benefits, and causes some to receive no benefits at all (e.g., claimants who find employment before the delay created by the lag quarter is over).

IDES submits that the district court correctly held that section 237 is a valid eligibility requirement beyond the reach of the "when due" clause and corresponding regulations, not an administrative method. In its view, the cases that have found state unemployment insurance provisions to conflict with the "when due" clause have all dealt with situations in which an initial determination of eligibility had been made, thus making payment in those cases "due" and hence subject to the "when due" clause. In *California Department of Human Resources Development v. Java,* 402 U.S. 121, 133, 91 S.Ct. 1347, 1355, 28 L.Ed.2d 666 (1971), for example, the Court held that a California procedure which suspended payments for a median period of seven weeks pending administrative appeal violated the "when due" clause; however, the statute violated the prompt payment requirement "after an initial determination of eligibility." IDES attempts to distinguish *Fusari* on the grounds that each plaintiff in that case "had filed a valid initiating claim and received benefits for a period of time." *Fusari,* 419 U.S. at 382 n. 3, 95 S.Ct. at 536 n. 3. IDES concedes that *Jenkins* stated that benefits cannot be delayed by postponing eligibility determinations; however, it contends that no delay in eligibility status has occurred, because claimants such as the plaintiff class are simply ineligible when they apply. Finally, like the plaintiff class, IDES submits that eligibility criteria measure attachment to the work force. Unlike the class, though, IDES submits that section 237's base period, like other

eligibility criteria, aids in excluding those claimants with the most tenuous attachment to the work force.

Although IDES's contention concerning section 237's status as an eligibility provision is "not an absurd argument," *Jenkins,* 691 F.2d at 1229, we cannot accept it. First, IDES cannot persuasively distinguish *Jenkins.* In addressing the same argument in essentially the same context, we recognized in *Jenkins* that such an argument would render the "when due" clause a virtual nullity, limiting it to those cases "where the state concedes that unemployment is due someone and simply fails to establish administrative mechanisms that result in paying him within a reasonable time." *Id.; see also Fusari,* 419 U.S. at 388 n. 15, 95 S.Ct. at 539 n. 15 (stating that this argument "would nullify the congressional intention of requiring prompt administrative provision of unemployment benefits"). If the content of the "when due" clause were so eviscerated, "a state could take all the time in the world to decide that an unemployed person was entitled to compensation, provided that it got the check to him promptly when it did decide." *Jenkins,* 691 F.2d at 1229. As we stated in *Jenkins,* we believe that Congress had larger purposes for the clause in mind.

In the same vein, the Secretary as amicus curiae asserts that *Jenkins* is inapposite because an initial determination of eligibility had already been made in that case, which thus implicated the "when due" clause.[7] The proviso at issue in *Jenkins*—the "held in abeyance" proviso—expressly stated that "a

---

7. We recognize that in some of the relevant cases the state agency at issue had made an initial determination of eligibility and that payment was therefore "due." *See, e.g., Java,* 402 U.S. at 133, 91 S.Ct. at 1355 (holding that the "when due" clause was violated by lengthy delay in administrative appeal "after an initial determination of eligibility ha[d] been made"). In *Fusari,* however, the Supreme Court indicated that its decision in *Java* did not turn on the fact that only payments, and not eligibility, were suspended by the effect of the statute at issue in that case. Rather, *Fusari* rejected the conclusion of the district court in its case that, because a claimant who had initially been determined eligible subsequently had been deemed ineligible, payments were no longer "due" under the "when due" clause. The Court stated that "[s]uch a definition of the 'when due' requirement of federal law

would leave little vitality to *Java*." *Fusari,* 419 U.S. at 388 n. 15, 95 S.Ct. at 539 n. 15.

Although no Supreme Court case has addressed the applicability of the "when due" clause when no initial determination of eligibility has been made, the Third Circuit was presented with such a scenario in *Wilkinson v. Abrams,* 627 F.2d 650 (3d Cir.1980). In that case, the Secretary of Labor tried to distinguish *Fusari* on the basis that "the claimant had at least received an initial administrative determination of eligibility for unemployment compensation benefits." *Id.* at 661 n. 14. The Secretary argued "that where a claimant has never been determined eligible, the 'when due' requirement is inapplicable." *Id.* The court rejected the Secretary's argument, stating that the Secretary's "conclusion would no less nullify the 'vitality' of *Java* than the conclusion of the *Fusari* district court." *Id.*

determination of [a claimant's] benefit rights shall be held in abeyance pending the result of any legal proceedings." *Id.* at 1227. In *Jenkins,* therefore, no initial determination of benefits had been made and no payments were "due" in the sense that IDES urges on us in this case. We nonetheless held that the provision at issue was subject to and, indeed, violated the "when due" clause. Similarly, we now hold that section 237 is subject to the "when due" clause.

Second, IDES argues at length that section 237 functions as a measurement of each claimant's attachment to the work force. IDES submits that this function demonstrates that section 237 is as much an eligibility provision that defines the class of claimants as any of the state's monetary provisions, such as section 500 E's qualifying wages requirement. *See supra* note 4. However, IDES has conceded in more than one place that the gap created by section 237's base period, in which a claimant's lag quarter wages are not reported, "is necessary because some time is required for employers to report wages and for the [state agency] to make that information available in the local [unemployment insurance] offices where claims are first taken and adjudicated." App. VII at 67 (Stipulated Facts); *see also* Appellee's Br. at 42 (stating that "[s]ection 237's base period facilitates the State's utilization of wage recording"). In other words, section 237's base period is essentially an administrative method employed to accommodate the time needs of a wage record system. In a world of high-speed information exchange, the lag quarter would not exist; yet an eligibility requirement like the "voluntary leaving" provision would. *See* 820 ILCS 405/601. We therefore hold that section 237 is an administrative provision and,

as such, is subject to the timeliness requirements of the "when due" clause.

B. *Whether Section 237 Violates the "When Due" Clause*

The next analytical step is to determine whether section 237 "reasonably insure[s] the full payment of unemployment benefits to eligible claimants with the greatest promptness that is administratively feasible." 20 C.F.R. § 640.3(a). To do so, it is necessary to decide whether section 237's base period "strikes a reasonable balance" between the plaintiff class's interest in prompt payment of unemployment insurance benefits and the state's interest in minimizing the costs of eliminating delay and in preventing fraudulent claims. *Jenkins,* 691 F.2d at 1230, 1233.

As a "statutory requirement that embodies notions of timeliness, accuracy, and administrative feasibility," assessing section 237 "inevitably will generate fact-specific applications." *Fusari,* 419 U.S. at 388 n. 15, 95 S.Ct. at 539 n. 15. Unfortunately, however, because the district court entered judgment for IDES as a matter of law, it made practically no helpful factual findings from the week-long trial it conducted.[8] Because this court is not the proper forum in which to engage in factual findings, we must remand this case to the district court. In *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 486–87, 97 S.Ct. 1898, 1907–08, 52 L.Ed.2d 513 (1977), the Supreme Court decided to resolve whether a certain Ohio statute conflicted with the "when due" clause even though the district court had not dealt with the issue, much less made any findings of fact. However, the Court did so because the resolution of that issue did not entail any findings of fact. The Court indicated that if

**8.** The only findings the district court made that could be said to be factual stemmed from its determination that section 237 does not present an "indefinite delay" to unemployment insurance claimants. Mem.Op. at 15. The court engaged in this determination despite the fact that it had already held as a matter of law that section 237 was an eligibility provision not subject to the "when due" clause. For reasons difficult to discern, the district court treated dicta set forth in *Jenkins* (in the context of discussing a state's obligation to make prompt eligibility determina-

tions) as establishing a legal standard. *Jenkins* stated that "[the claimant] must meet the state's eligibility criteria but if the state delays indefinitely in deciding whether he has met them it defeats the objectives behind requiring prompt payment." *Jenkins,* 691 F.2d at 1229. The term "indefinitely" only made the point that states are required under the "when due" clause not only to make prompt payment of benefits, but also to make eligibility determinations promptly; it was not a new legal standard for examining eligibility criteria.

findings of fact had been involved, it likely would have remanded the case to the district court. *Id.* We therefore believe that the proper course is to remand this case so that the district court can proceed to determine, on the evidence it has already taken and any new submissions from the parties, whether section 237 insures the greatest promptness in paying unemployment benefits that is administratively feasible, making all factual findings that it deems necessary to the resolution of that issue.[9] The district court's sole task is to determine whether the current Illinois scheme is compatible with the "when due" clause. It is not its responsibility to mandate an alternative. If the district court should determine that the current Illinois scheme does not comply with the "when due" clause—a determination upon which we emphatically express no opinion—it will be the prerogative of Illinois, not the district court, to determine the alternative.

### Conclusion

For the foregoing reasons, we reverse the decision of the district court that section 237 is an eligibility provision as a matter of law. We hold that section 237 is an administrative method subject to the strictures of the "when due" clause of the Social Security Act. We therefore remand this case to the district court for factual findings and a determination of the issue of section 237's compliance with the "when due" clause and corresponding regulations.

REVERSED AND REMANDED.

### ORDER

#### May 27, 1994

The plaintiffs-appellants have asked that we make it clear that further proceedings in the district court may be before the judge who heard the case. Accordingly, we clarify our remand order by stating explicitly that the proceedings on remand may be conduct-

9. We have held as a matter of law that lag periods such as IUIA section 237 are administrative methods and not eligibility provisions, and as such are subject to the strictures of the "when due" clause. We note, however, that with respect to whether a given lag period is acceptable under the Secretary's regulations—specifically,

ed by the judge who originally heard the matter.

whether it reasonably insures payment of benefits "with the greatest promptness administratively feasible," 29 C.F.R. § 640.3(a)—the Secretary has the authority to issue regulations outlining in more detail what is and is not an acceptable lag period under the regulations.