**Marcel YOUAKIM, Linda Youakim, individually, and as foster parents, and Tim Robertson, and all others similarly situated, Plaintiffs–Appellees/Cross–Appellants,**

v.

**Jess McDONALD, Director, Illinois Department of Children and Family Services,\* Defendant–Appellant/Cross–Appellee.**

Nos. 95–2575, 95–2813.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1995.

Decided Dec. 6, 1995.\*\*

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 17, 1996.

---

\* In accordance with Fed.R.Civ.P. 25(d)(1), Jess McDonald, current Director of the Illinois Department of Children and Family Services, has been substituted as the defendant in this action for Jerome Miller, the Department's director when the suit was originally filed.

\*\* This opinion was originally released in typescript.

Diane Redleaf, John M. Bouman, Robert E. Lehrer (argued), Michelle J. Gilbert, Stacey E. Platt, Legal Assistance Foundation of Chicago, Chicago, IL, Kenneth Kandaras, John Marshall Law School, Chicago, IL, Pe-

ter J. Schmiedel, Office of the Public Guardian, Juvenile Division, Chicago, IL, for Plaintiffs–Appellees in No. 95–2575.

Rita M. Novak, Office of the Attorney General, Chicago, IL, Esther Nkonye Iwerebon, Eric J. Glover, Daniel M. Feeney, Christina M. Tchen (argued), Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Defendant–Appellant, in No. 95–2575.

Diane Redleaf, John M. Bouman, Robert E. Lehrer (argued), Michelle J. Gilbert, Stacey E. Platt, Legal Assistance Foundation of Chicago, Chicago, IL, Kenneth Kandaras, John Marshall Law School, Chicago, IL, for Plaintiffs–Appellants in No. 95–2813.

Rita M. Novak, Office of the Attorney General, Chicago, IL, Eric J. Glover, Christina M. Tchen (argued), Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for Defendant–Appellee in No. 95–2813.

Before WOOD, Jr., ROVNER, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

The dispute before us in this twenty-two year old case concerns the implementation of legislative reforms to Illinois' foster care benefit program. *See* P.A. 89–21, *amending,* 20 ILCS 505/5. Earlier this year, the Illinois Department of Children and Family Services ("DCFS" or "the Department") proposed its Home of Relative Reform Plan ("HMR Reform"), which was passed by the Illinois General Assembly and signed into law by Illinois' Governor in June of this year. Under HMR Reform, all homes providing foster care must be licensed under state law before resident children will be eligible to receive foster care benefits. Prior to the effective date of the reforms (July 1, 1995), however, Illinois required a license only for homes providing foster care to non-relative children. Children who were cared for by relatives, by contrast, were eligible to receive benefits although they resided in unlicensed homes. The effect of the reforms, then, is to terminate the foster care benefits of children in relative homes while the homes attempt to become licensed.

Plaintiffs, a class of foster parents and children who stand to lose their benefits because their homes are not yet licensed, invoked the district court's continuing jurisdiction to enforce the August 24, 1976 judgment entered in this case for the purpose of challenging the implementation of the reforms. Plaintiffs do not quarrel with the new licensing requirement but contend that their benefits cannot be terminated before they are provided an adequate opportunity to become licensed. They argue that the transition process, by denying them such an opportunity, violates the earlier judgment and the Due Process Clause of the Fourteenth Amendment. On the day before the reforms were to take effect, the district court enjoined the Department's Director from terminating or suspending foster care payments to children in unlicensed relative homes without first providing those homes the opportunity to have a license application determined on its merits. The district court explained in a detailed opinion how the proposed implementation of HMR Reform would violate the 1976 judgment and plaintiffs' right to due process. *See Youakim v. McDonald,* No. 73 C 635, slip op. (N.D.Ill. June 30, 1995). The Director appeals that interlocutory injunction to this court, invoking our jurisdiction under 28 U.S.C. § 1292(a)(1).[1] We now affirm the district court's injunction as modified below.

## I. BACKGROUND

The relevant facts are not disputed. The parties stipulated to many of the facts below,

---

1. The Director asked the district court to stay enforcement of its order pending resolution of his appeal. That court denied the Director's motion, but another panel of this court agreed to expedite the Director's appeal and to stay enforcement of the district court's injunction. This panel then heard oral argument on September 27, 1995, three days prior to the date on which children in approved but unlicensed relative homes were scheduled to lose their benefits. Af-

ter argument, we vacated the stay order, thus preventing the Director from enforcing the scheduled cut-off date. On the following day, however, we were notified that DCFS had extended the cut-off date to January 1, 1996. Because this ensured that children in approved relative homes would retain their benefits during the pendency of this appeal, we granted the Director's motion to reconsider and reimposed the stay.

and the district court made further factual findings after a two-day evidentiary hearing. Because the Director has not challenged the district court's findings here, we accept them as true and describe them below along with the stipulated facts. First, however, we provide a brief history of the earlier litigation that culminated in the entry of the 1976 judgment.

### A. The Earlier Case

The initial dispute in this case involved Illinois' decision to exclude children in relative homes from eligibility for foster care benefits. *See Miller v. Youakim*, 440 U.S. 125, 130–31, 99 S.Ct. 957, 961–62, 59 L.Ed.2d 194 (1979) (citing Ill.Ann.Stat. ch. 23, § 2212.17 (Supp.1978)). Illinois paid such benefits only to children in homes that were licensed under state law, and it prohibited the licensing of relative homes. Thus, a child placed with a relative was ineligible to receive foster care benefits although the same child would have been eligible had he been placed in the home of a non-relative. The district court certified a class of related children and foster parents and subsequently held that Illinois' policy of denying foster care benefits to otherwise eligible children in relative homes violated §§ 401 and 408 of the Social Security Act, 42 U.S.C. §§ 601 & 608. *See Youakim v. Miller*, 431 F.Supp. 40 (N.D.Ill.1976). In a judgment dated August 24, 1976, the court invoked the Constitution's Supremacy Clause to enjoin Illinois from enforcing any state law or administrative policy that had the effect of denying full foster care benefits to such children. The district court's judgment was affirmed by this court, 562 F.2d 483 (7th Cir.1977), and by a unanimous United States Supreme Court, 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979). The present dispute involves developments in Illinois since the Supreme Court's 1979 decision.

### B. Pre–Reform System

When DCFS takes over custody or guardianship of a child, it attempts to make a substitute placement with either a relative, a non-relative, a group home, or an institution. Subsequent to the Supreme Court's decision in *Miller*, Illinois has paid foster care benefits to children placed in three categories of homes—preapproved, approved, and licensed. Both the preapproved and approved categories were comprised entirely of relative homes, because Illinois law still required, as it had prior to the *Miller* decision, that all non-relative caregivers be licensed. Although a relative home could also obtain a license, it was not required to do so before a child could be placed and receive foster care benefits.

In contrast to non-relative homes, DCFS is permitted to place a child in a relative home even before that home becomes licensed or approved under state law. The home must only pass an initial safety check that is considerably less detailed and onerous for both DCFS and the caregiving family than the licensing and approval processes. *See* 89 Ill.Admin.Code § 335.202 (detailing "pre-conditions" for placement of child in relative home) (repealed effective July 1, 1995). A home that has passed this initial safety check is referred to as a "preapproved" home. Such a home could subsequently become approved or licensed under state law, although it had no financial incentive to do so because licensure was not a requirement for the receipt of full foster care benefits. Because these homes were neither approved nor licensed under state law, however, the federal government did not reimburse the State for benefits paid to resident children under the terms of the Social Security Act. *See* 42 U.S.C. § 672(c) (providing for federal reimbursement of payments made only to children in licensed or approved homes).

In 1986, Illinois officially recognized a category of "approved" relative homes, which were required to meet standards "substantially the same with regard to the safety, health and welfare of children as those promulgated for licensure of unrelated foster family homes pursuant to the Child Care Act of 1969." 89 Ill.Admin.Code § 335.102 (repealed effective July 1, 1995); *see also* 89 Ill.Admin.Code § 402 (setting out licensing standards for foster family homes) (amended

effective July 1, 1995).[2] Once DCFS confirmed that a relative home met its licensing standards, the State of Illinois qualified for federal reimbursement of foster care benefits paid to resident children even if the home was not actually licensed. *See* 42 U.S.C. § 672(c) (a "foster family home" under the Social Security Act includes a home that "has been approved, by the agency of such State having responsibility for licensing homes of this type, as meeting the standards established for such licensing"). The district court found that Illinois created the approved category in 1986 at least in part to make it easier for DCFS to place dependent children with relative caregivers.

When a child is first placed in DCFS custody or guardianship, she is assigned a caseworker who attempts to procure a placement for that child. The caseworker also has the responsibility, once a placement is made, of shepherding the caregiver through the approval and licensing processes. The caseworker assigned in any given circumstance may be employed by DCFS itself, or by one of sixty-seven child welfare agencies (*e.g.*, Catholic Charities) that work on behalf of the Department. As of April 30, 1995, the cases of 31,596 out of 47,007 dependent children placed in private homes were managed by private welfare agencies rather than by DCFS itself.[3] Nine of the sixty-seven participating private welfare agencies are what we will call "approval only," meaning that caseworkers from those agencies have no authority to license or to participate in the licensing of a foster family home. Children who were assigned to a caseworker from such an agency thus had little if any opportunity to reside in a licensed home.

The district court found, moreover, that to the extent DCFS and the private agencies

encouraged preapproved relative caregivers to become either approved or licensed, they generally encouraged the approval process, which was less onerous for both the placing agency and the caregiving family. Whether a relative home was licensed or merely approved also made no difference to the State's ability under the Social Security Act to receive federal reimbursement for dispersed benefits. *See* 42 U.S.C. § 672(c). The statistical evidence before the district court revealed that as of April 30, 1995, only 1.2 percent of all children residing in relative homes lived in licensed homes, whereas 42.6 percent of those children lived in approved homes. An additional 22.2 percent lived in preapproved homes that had applications for approval pending.[4] The district court found from the statistical evidence that the private welfare agencies had been more successful than the Department in getting relative homes approved or licensed—44.8 percent of private agency homes were approved or licensed as compared to only 21.4 percent of DCFS homes. The Department's failure in this regard is surprising in light of the fact that the State of Illinois is entitled to federal reimbursement only for foster care benefits paid to children in licensed or approved homes. Because the State also paid unreimbursed benefits to relative children in preapproved homes, DCFS had a significant incentive to shepherd relative homes at least through the approval process. The fact that so many relative children received unreimbursed benefits from the State was one factor that prompted the reforms.

## C. HMR Reform

DCFS proposed HMR Reform on March 1, 1995, and it became law a little more than

---

**2.** It does not appear that in 1973, when the Youakims filed this lawsuit, the State of Illinois maintained an official category of "approved" relative homes. The district court found as a factual matter, however, that the Youakim home had been approved by the State of Illinois as meeting its licensing standards for purposes of section 408 of the Social Security Act, 42 U.S.C. § 608. 431 F.Supp. at 43–44 & nn. 4 & 5; *see also* 562 F.2d at 488 (rejecting claim that district court's factual finding was in error).

**3.** More than half of the total number of children in DCFS custody had been placed in relative homes (26,368 out of 47,007), which was consistent with Illinois' preference for relative placements. *See* 20 ILCS 505/7(b) (amended effective July 1, 1995).

**4.** The statistics are similar if relative homes themselves, as opposed to children in relative homes, are considered: 1.3 percent of relative homes were licensed, 35.2 percent were approved, and 26.1 percent had applications for approval pending.

three months later. The operative reform provision relevant to this litigation provides as follows:

> Effective July 1, 1995, only foster care placements licensed as foster family homes pursuant to the Child Care Act of 1969 shall be eligible to receive foster care payments from the Department. Relative caregivers who, as of July 1, 1995, were approved pursuant to approved relative placement rules previously promulgated by the Department at 89 Ill.Adm.Code 335 and had submitted an application for licensure as a foster family home may continue to receive foster care payments only until the Department determines that they may be licensed as a foster family home or that their application for licensure is denied or until September 30, 1995, whichever occurs first.

P.A. 89–21, *amending* 20 ILCS 505/5(u–5). Under HMR Reform, then, Illinois will pay foster care benefits only to those relative and non-relative homes that are licensed under state law. The new licensing requirement has no effect on non-relative homes, as Illinois has always required such homes to be licensed. For existing relative homes, however, the impact of the reforms is significant and potentially devastating. Children in pre-approved relative homes who qualified to receive foster care benefits prior to July 1, 1995 would have their benefits eliminated on that date, regardless of whether their caregiving home applied to DCFS for a license on or before June 30, 1995.[5] Foster care benefits to children in preapproved homes would be reinstated under HMR Reform only if the home were to ultimately succeed in obtaining a license, and the affected child would not then be entitled to recover the benefits lost between July 1 and the date of licensing. As of July 1, children in preapproved homes would begin to receive assistance under two alternative programs, but at significantly reduced benefit levels.

While HMR Reform cuts off benefits to children in preapproved relative homes, it eliminates entirely the category of approved relative homes. Those homes that were previously approved by the State of Illinois as meeting its licensing standards must also become licensed in order for resident children to retain their foster care benefits. In contrast to its treatment of preapproved homes, however, HMR Reform provides a transition process that enables approved homes to apply for a license while resident children retain their current benefits. If an approved home submits a license application on or before June 30, resident children retain their benefits until the Department denies the application or until September 30, 1995, whichever occurs first.[6] But this procedure does not ensure that a child's benefits will not be eliminated before the Department renders a decision on the license application. Indeed, the district court found from the statistical evidence that the Department would be unable to process and decide the applications of approved homes prior to the scheduled cut-off date.[7]

After the implementation of HMR Reform, relative and non-relative caregivers will be required to meet the same licensing standards, which are slightly more stringent than those that were in place prior to HMR Reform. A home that was licensed as of July 1,

---

**5.** The foster care benefits of children in preapproved homes were in fact eliminated in July of this year, after a panel of this court stayed enforcement of the district court's injunction pending resolution of the Director's appeal. Because the order we are reviewing speaks of the implementation process as a future event, rather than as having already begun, we follow the same format for the sake of consistency, recognizing however that certain of the reforms already have been implemented by the time of this writing.

**6.** The Director's counsel told us at oral argument that approximately ninety percent of homes in the approved category submitted license applications by June 30. As we explained *supra*, at n. 1,

DCFS extended the September 30 cut-off date to January 1, 1996.

**7.** When the court made that finding, the cut-off date was September 30, 1995, rather than January 1, 1996. The court was unable from the evidence to estimate the time it would take DCFS to process the large number of license applications that would be generated by the reforms, finding only that the average period for processing an application would exceed ninety days. (Dist.Ct.Mem.Op. at 17–18.) The Director's counsel also was unable to estimate at oral argument how many license applications would remain pending after September 30.

1995, however, need not meet the new standards until its current license expires.[8] Approved and preapproved relative homes, however, must immediately meet the new licensing standards in order to retain their current benefits.

Prior to HMR Reform, it was the Department's policy that preapproved caregivers must apply to be approved or licensed to retain a child placed in their care. As the district court observed, however, the Department rarely enforced this policy because approximately one-third of relative homes were both unapproved and unlicensed as of April 30, 1995. (Dist.Ct.Mem.Op. at 12 n. 11.) Under HMR Reform, a preapproved relative home is required to obtain a license only to enable a resident child to receive foster care benefits; the lack of a license does not affect its ability to provide care for the child. Thus, DCFS will not remove children previously placed with approved or preapproved relative homes if those homes fail to apply for or to obtain a license under HMR Reform. It simply will refuse to pay foster care benefits to children in such homes.

DCFS began the process of implementing HMR Reform even before Illinois' Governor signed the legislation into law. The Department first notified relative caregivers of the reforms in April 1995. It then provided a second notice on April 28, 1995, and this time included a license application in notices sent to approved homes and preapproved homes with applications for approval pending. Preapproved homes that had not yet applied for approval were instructed to obtain a license application from their caseworker. DCFS sent yet another notice to relative caregivers on approximately June 12, 1995.

### D. The Proceedings Below

Plaintiffs invoked the district court's continuing jurisdiction under the 1976 judgment to revive this long-dormant litigation, arguing that the implementation of HMR Reform would violate the judgment order. Plaintiffs asked that the implementation process be enjoined and that the Director be held in contempt. After expedited discovery and briefing, the district court absolved the Director of the contempt charge, but on the day before their scheduled effective date, the court enjoined the implementation of the reforms as to existing benefit recipients residing in approved and preapproved relative homes. Specifically, the court prevented the Director from eliminating the foster care benefits of children in unlicensed relative homes without first providing those homes an adequate opportunity to become licensed. The court concluded that the transition proposed by the Department would violate the judgment order, the Social Security Act, and the Due Process Clause of the Fourteenth Amendment. To remedy these violations, the court required DCFS to mail an additional notice of the reforms to both approved and preapproved relative caregivers and to include with the notice a license application. The caregiver would then have thirty-five days from the date of mailing to submit the application to the Department. DCFS would be entitled to eliminate the foster care benefits of any child in a relative home that failed to submit a license application within thirty-five days. For children in homes submitting timely applications, however, DCFS would be enjoined from eliminating benefits until a decision was rendered on the application. The court's injunction had the effect, therefore, of prohibiting enforcement of the September 30, 1995 (now January 1, 1996) cut-off date as to those approved homes with timely license applications pending, and of preventing the July 1, 1995 termination of benefits to children in preapproved homes.

## II. DISCUSSION

We review the district court's interlocutory injunctive order in accordance with Fed.R.Civ.P. 52(a). We review the court's factual findings for clear error and its conclusions of law de novo. *Durasys, Inc. v. Leyba,* 992 F.2d 1465, 1471 (7th Cir.1993). To the extent Judge Nordberg interpreted the terms of the 1976 judgment, which was entered by a different district judge, we accord

---

8. Prior to HMR Reform, a license was valid for two years unless revoked by the Department (89 Ill.Admin.Code § 402.6(a) (1994)), but a license issued under the new standards is valid for four years. 89 Ill.Admin.Code § 402.7(a) (effective July 1, 1995).

his interpretation no deference and review the requirements of that judgment de novo. *Schering Corp. v. Illinois Antibiotics Co.,* 62 F.3d 903, 908–09 (7th Cir.1995). We first consider whether plaintiffs were entitled to relief under the 1976 judgment and the provisions of the Social Security Act giving rise to that judgment. We then address plaintiffs' claim under the Due Process Clause. *See Atkins v. Parker,* 472 U.S. 115, 123, 105 S.Ct. 2520, 2525–26, 86 L.Ed.2d 81 (1985) (considering statutory issue prior to reaching constitutional question).

*A. 1976 Judgment Order*

1.

Plaintiffs contend that the transition to HMR Reform violates the 1976 judgment, which prohibits the State from enforcing any law or administrative policy that has the effect of denying full foster care benefits to otherwise eligible children in relative homes. Plaintiffs maintain that by eliminating the foster care benefits of children in unlicensed relative homes, DCFS will be discriminating against those homes on the basis of their relative status. The Director disagrees, arguing that because relative and non-relative homes have the same opportunity to become licensed under HMR Reform, there is no violation of the earlier judgment. Yet the district court found that the licensing opportunities are the same only for relative children and parents who enter the foster care system after the July 1, 1995 effective date of the reforms. All plaintiffs here were receiving foster care benefits under Illinois' pre-reform system, and they challenge only the process of transition to rather than the substance of the reforms. The district court found that the Department's proposed transition had the effect of denying full benefits to otherwise eligible children in relative homes solely because of their relative status. The court's finding was based on the undisputed fact that Illinois had previously channelled relative homes toward the approved or pre-approved categories without providing those homes an equal opportunity to become licensed. The court concluded that by now eliminating the benefits of children in unlicensed relative homes, the Department would be disfavoring relative caregivers in

violation of the earlier judgment order, and it therefore enjoined implementation of that aspect of the reforms.

 The 1976 judgment is in the nature of an injunction, and in construing its terms, we must pay particular heed to the nature of the dispute in which it originated. In general terms, we must construe injunctions in light of the circumstances that produced them, which may include the nature of the original claim, the relief that was sought, the evidence presented at any hearing or trial, the issues actually decided by the earlier tribunal, and the mischief the injunction was designed to eradicate. *See City of Vicksburg v. Henson,* 231 U.S. 259, 273, 34 S.Ct. 95, 100, 58 L.Ed. 209 (1913); *Haskell v. Kansas Natural Gas Co.,* 224 U.S. 217, 223, 32 S.Ct. 442, 444, 56 L.Ed. 738 (1912); *United States v. Christie Indus., Inc.,* 465 F.2d 1002, 1007 (3d Cir.1972). This is another way of saying that the terms of an injunction, like any other disputed writing, must be construed in their proper context. *Cf. Florida East Coast Ry. Co. v. CSX Transp., Inc.,* 42 F.3d 1125, 1129 (7th Cir.1994) (language in settlement agreement must be interpreted with attention to the circumstances under which it was written). As a result, courts at times will construe a broadly-worded injunction more narrowly in order to be faithful to the issues actually raised and decided in the earlier litigation. *See Vicksburg,* 231 U.S. at 269, 34 S.Ct. at 98–99; *Nerney v. New York N.H. & H.R. Co.,* 83 F.2d 409, 411 (2d Cir.1936). At the same time, however, courts have found conduct to violate an injunction if it threatens the spirit if not the literal language of the earlier order. *See Christie Indus.,* 465 F.2d at 1009–11; *John B. Stetson Co. v. Stephen L. Stetson Co.,* 128 F.2d 981, 983 (2d Cir. 1942); *see also Schering Corp.,* 62 F.3d at 906–07.

The Director here argues that in finding a violation of the 1976 judgment, the district court impermissibly expanded the scope of a limited and relatively ancient injunction. In the Director's view, the 1976 judgment was addressed only to a limited violation of the federal Social Security Act, and it thus should not be read to prohibit substantive

reforms to Illinois' foster care program so long as access remains equally open and available to relatives and non-relatives alike. In order to address the Director's argument, then, we must consider the nature of the dispute that culminated in the earlier judgment.

### 2.

In 1973, when the underlying lawsuit was filed, only children in homes licensed by the State of Illinois were eligible to receive foster care benefits. *See Miller*, 440 U.S. at 131, 99 S.Ct. at 962. Under state law, moreover, relative homes could not obtain a license because Illinois defined a "foster family home" to include only those facilities providing family care to children "unrelated to them." *See id.* at 130–31, 99 S.Ct. at 961–62 (quoting former Illinois statute). Thus, although their home had been approved by DCFS "as meeting the licensing standards established for unrelated foster family homes," the Youakims were ineligible under Illinois law to receive foster care benefits because the children in their care were relatives. *Id.* at 130, 99 S.Ct. at 961; *see also Youakim*, 562 F.2d at 488; 431 F.Supp. at 43–44 & n. 4. Plaintiffs maintained that Illinois' practice of paying benefits only to children in unrelated homes violated the federal Social Security Act, which in their view did not distinguish between related and unrelated foster homes.

The Social Security Act sets out the circumstances under which the federal government will reimburse states for foster care payments made to dependent children. To qualify for reimbursement, the state must have placed a child in a " 'foster family home or child-care institution.' " *Miller*, 440 U.S. at 127–28, 99 S.Ct. at 960 (quoting 42 U.S.C. § 608(a)(3), *now codified at* 42 U.S.C. § 672(a)(3)). "Foster family home" is defined in the Act to include a home " 'which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing homes of this type, as meeting the standards established for such licensing.' " *Id.* at 127 n. 1, 99 S.Ct. at 960 n. 1 (quoting 42 U.S.C. § 608(f), *now codified at* 42 U.S.C. § 672(c)). The question

raised by plaintiffs' earlier claim was thus whether Illinois' decision to exclude relative homes from its definition of a "foster family home," and therefore to deny benefits to children in relative homes that had been approved by DCFS, violated federal law.

The district court, this court, and a unanimous United States Supreme Court all found that Illinois was violating the Act. 431 F.Supp. 40 (N.D.Ill.1976), *aff'd*, 562 F.2d 483 (7th Cir.1977), *aff'd*, 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979). The Supreme Court held that the Social Security Act requires benefits to be paid to "any home that a State approves as meeting its licensing standards." 440 U.S. at 135, 99 S.Ct. at 964; *see also id.* at 145, 99 S.Ct. at 969 ("we hold that the [federal] program encompasses foster children who, pursuant to a judicial determination of neglect, have been placed in related homes that meet a State's licensing requirements for foster homes."). This court had reached a similar conclusion: "if the Youakims' home has been approved by the DCFS as meeting the standards established for the licensing of foster care homes, it falls within the statutory definition." 562 F.2d at 487. Thus, the Supreme Court and this court found it inconsistent with federal law for Illinois to approve related homes as meeting its licensing standards but then to deny benefits to those homes on the ground that they were not actually licensed. *See* 440 U.S. at 140–41, 99 S.Ct. at 966–67; 562 F.2d at 487–88. This was the "mischief" the 1976 judgment was designed to eradicate.

### 3.

The question here is whether Illinois' transition to HMR Reform also denies benefits to otherwise eligible children in relative homes. Plaintiffs contend that by denying benefits to children in approved and preapproved relative homes while those homes attempt to become licensed under HMR Reform, the Director will violate paragraph four of the judgment order, which provides as follows:

Defendants, their agents, employees and all other persons in active concert with them are enjoined from:

(a) enforcing [Illinois law] and all implementing administrative policies and procedures, insofar as they exclude from eligibility, or deny full [Title IV–E] payments or ancillary benefits to, foster children living in foster homes maintained by related foster parents, and to these related foster parents, when such children and such parents are otherwise eligible for such payments and benefits;

(b) failing to pay full [Title IV–E] payments to foster children living in foster homes maintained by related foster parents, and to these related foster parents, when such children and parents are otherwise eligible for such payments.…

(August 24, 1976 Judgment ¶ 4.) The parties focus their dispute on whether relative children and parents in approved and preapproved homes are "otherwise eligible" to receive foster care benefits under the terms of the judgment.

Plaintiffs maintain that relative children and parents are "otherwise eligible" under paragraph four "if they claim that they will meet federal statutory eligibility requirements, correctly interpreted." (Pl. Br. at 25.) Under plaintiffs' interpretation, then, it would make no difference whether a home has been approved or only preapproved under the pre-reform system because homes in both categories could claim, in applying for a license, that they in fact will meet federal eligibility criteria. The Director, by contrast, contends that relative children and parents are not "otherwise eligible" under paragraph four unless their homes actually have been licensed under Illinois law. Because HMR Reform eliminates the category of approved relative homes, the Director believes that " 'approved' relatives are no longer 'otherwise eligible' for [foster care benefits], unless [and until] they become licensed under the new licensing standards." (Director's Reply Br. at 8.) We do not believe that either of these interpretations is the correct one, as neither plaintiffs nor the Director pay proper heed to the nature of plaintiffs' claim in the underlying litigation or the violation of

federal law that the judgment was designed to eradicate.

The Supreme Court and this court found that Illinois' former practice of paying foster care benefits only to children under the care of non-relatives who were licensed under state law violated the Social Security Act because homes approved by a state as meeting its licensing standards are encompassed within the Act's definition of a "foster family home." *See Miller,* 440 U.S. at 135, 99 S.Ct. at 964; *Youakim,* 562 F.2d at 487. Thus, a state violates federal law by approving relative homes but denying benefits to children in those homes because the home is unlicensed. The Act of course does not require that a state approve any home as meeting its licensing standards, and as plaintiffs concede, Illinois does not violate the Act by eliminating the "approved" category and requiring in the future that dependent children reside in licensed homes before they will be eligible for foster care benefits. (*See* Dist. Ct.Mem.Op. at 21.)

But what of the many homes that Illinois already has approved as meeting its licensing standards? Does the State's subsequent elimination of the "approved" category have the effect, as the Director contends, of negating the status those homes previously attained and eliminating the State's obligation to pay benefits under the Act? We think not, because the State previously approved these homes as meeting its licensing standards and made that approval effective for a period of four years. *See* 89 Ill.Admin.Code § 335.300 (repealed effective July 1, 1995). The State is now attempting to remove the "approved" designation prior to the expiration of the four-year period without providing the affected homes an adequate opportunity to obtain a license before losing their benefits. Yet because homes in the approved category meet Illinois' licensing standards, as determined by the Department itself,[9] those homes are covered by the Act (*see* 42 U.S.C. § 672(c)), just as the Youakim home was in 1976. The fact that Illinois now has eliminated the "approved" category and has required

---

**9.** *See* Ill.Admin.Code § 335.102 (repealed effective July 1, 1995) (approval standards "are substantially the same with regard to the safety, health and welfare of children as those promulgated for licensure of unrelated foster family homes pursuant to the Child Care Act of 1969.").

all foster homes to be licensed does not eviscerate the fact that it already approved these relative homes as meeting its licensing standards. *Cf. Miller v. Carlson,* 768 F.Supp. 1331, 1339 (N.D.Cal.1991) (enjoining California from eliminating Aid to Families with Dependent Children ("AFDC") payments to plaintiffs in previously-approved educational and training programs). It is thus unpersuasive for the Director to argue that plaintiffs in the "approved" category are not actually "approved" because the State eliminated that category under HMR Reform. Illinois also had no official "approved" category in 1976, but the Supreme Court required the State to pay foster care benefits to the Youakims, who had been approved by the State as meeting its licensing standards. *See* 440 U.S. at 130, 137–38, 99 S.Ct. at 961, 965; *see also Youakim,* 562 F.2d at 487–88 & n. 5. The claim of the present plaintiffs is even stronger, as they have officially been approved as meeting the State's licensing standards.

In short, the Director's argument that approved relative homes are ineligible for foster care benefits because they are not licensed fares no better today than it did in the 1970s. *See Youakim,* 562 F.2d at 488. This court and the Supreme Court held that a licensing policy under which a state approves homes as meeting its licensing standards without actually issuing a license, and then denies benefits on the ground that the home is unlicensed, violates the Act, because children in approved homes meet federal eligibility criteria and cannot be denied benefits. *Miller,* 440 U.S. at 134–135, 145, 99 S.Ct. at 963, 969; 562 F.2d at 486–87. It was therefore a violation of the Act in 1976 for Illinois to license and to pay benefits only to children in unrelated homes, and we think it also violates the Act today for Illinois to deny benefits to children in relative homes it previously approved as meeting licensing standards on the ground that the approved category has now been eliminated and the home is currently unlicensed, particularly where the State has provided approved homes with little if any opportunity to become licensed.

The Director tells us, however, that these situations are distinguishable because homes currently in the approved category always had the opportunity to become licensed but failed to avail themselves of that opportunity. Yet the district court found that DCFS itself was responsible for the unlicensed status of these homes (Dist.Ct.Mem.Op. at 23), and its findings in that regard have not been challenged on appeal. Specifically, the district court found that the licensing process was not effectively available to relative homes for two reasons. First, DCFS preferred to place children with relative caregivers, and "to the extent [it] encouraged relative caregivers to apply to become approved or licensed, DCFS usually encouraged the approval process, which was easier for both DCFS and the family involved." (Dist.Ct.Mem.Op. at 10, 16.)[10] Second, with respect to relative placements made by private agencies, which significantly outnumbered the placements made by DCFS itself, the licensing process was sometimes completely unavailable, as nine of sixty-seven private placement agencies were authorized to approve but not to license relative homes. (*Id.* at 16.) For homes handled by these agencies, then, no opportunity to obtain a license was ever available. (*Id.*) Because the licensing process was thus not equally available to relative homes in the years prior to HMR Reform, those homes are in much the same position today as relative homes were in 1976—*i.e.,* they could be approved as meeting Illinois' licensing standards, but they did not have the same opportunity as non-relative homes to become licensed. To deny foster care benefits to children in these approved homes during the

---

10. In that regard, the district court found:

> As of April 30, 1995, only 1.2% of all related children in foster care resided in licensed homes, while 42.6% of such children lived in approved homes. In addition, 22.2% of the preapproved homes had applications for approval pending. With respect to number of homes, the evidence is similar. As of April 30, 1995, 1.3% of all homes with related children

> were licensed while 35.2% were approved. Homes with pending applications for approval accounted for 26.1% of the total number of homes with related children.

(*Id.* at 17.) Moreover, the Director stipulated below that DCFS created the "approved" category in 1986 in part to make it easier for the agency to place children with relative caregivers. (*Id.* at 9.)

transition to HMR Reform on the ground that the home is not licensed will thus discriminate against children that are "otherwise eligible" for benefits under the Social Security Act solely on the basis of their relative status. Implementation of the reforms as to approved but unlicensed relative homes will therefore violate both the Act and paragraph four of the 1976 judgment. To prevent such a violation, the district court properly enjoined the Director from denying foster care benefits to children in approved relative homes until he has provided those homes an adequate opportunity to become licensed.[11]

4.

■ The district court's injunction was not limited to relative homes in the approved category, however, because it also prevents the Director from eliminating the benefits of children in preapproved relative homes.[12] The court did not distinguish between homes in the approved and preapproved categories but found that Illinois' former practices disfavored all relative caregivers in violation of the judgment order. Yet we do not believe that either the Social Security Act or the 1976 judgment would prevent the Director from implementing HMR Reform with respect to relative homes in the preapproved category, even if those homes had an application for approval pending on the effective date of HMR Reform. The 1976 judgment goes no further than to enjoin the State from implementing laws or policies that violate federal law, and Illinois would not violate the Social Security Act by eliminating the benefits it previously paid to children in relative homes that were neither licensed nor approved under state law.

■ As we explained above, section 672(c) defines a "foster family home" to in-clude licensed homes and those approved by the appropriate agency as meeting the state's licensing standards. Significantly, the statute encompasses only those homes that *have been approved* (42 U.S.C. § 672(c)), not, as plaintiffs suggest, homes merely claiming to be capable of meeting approval requirements. Consistent with the language of the statute, then, each court that considered the Youakims' earlier claim emphasized that the Youakim home *had been approved* by DCFS as meeting the licensing standards of the State of Illinois. *See* 440 U.S. at 130, 135, 99 S.Ct. at 964; 562 F.2d at 486, 488; 431 F.Supp. at 43–44 & n. 4. But a relative home not so approved is not a "foster family home" under the Act, and thus, the Act does not require the State to pay foster care benefits to a child in such a home. Indeed, if a state decides to pay foster care benefits to children in preapproved homes, as Illinois did, it receives no reimbursement from the federal government under the Act.

The fact that Illinois chose for a period of years to pay foster care benefits to children in preapproved homes does nothing to change the requirements of federal law. The State's decision to eliminate payments that were never required by the Act could not itself violate the Act. Moreover, plaintiffs in the preapproved category do not argue, and the district court did not find, that the former *approval* process was unavailable to them. Those plaintiffs had a fair opportunity to become "approved." Indeed, more than one-third of the relative homes in Illinois had been approved, and many more had applications for approval pending on the effective date of HMR Reform.[13] The district court focused instead on the fact that plaintiffs in the preapproved category lacked a financial incentive to endure the approval or licensing processes because Illinois voluntarily exceed-

---

11. As to these homes, the district court's injunction will not cost Illinois a cent because the federal government reimburses the State for foster care benefits paid to dependent children in approved homes.

12. The Director stopped paying benefits to these children, however, in July of this year, after a panel of this court stayed enforcement of the injunction.

13. The district court did find that there were certain administrative problems at DCFS that hindered the approval and licensing processes (Dist.Ct.Mem.Op. at 11), but the court did not rely on this fact in concluding that homes in the preapproved category also were entitled to relief under the Judgment Order. The court's findings in that regard, however, would not support a conclusion that the approval process was unavailable to relative homes.

ed its obligations under the Social Security Act and paid full benefits even to children in preapproved homes. Again, however, nothing in the federal statute required Illinois to extend foster care benefits to these children, and nothing prevents it from now eliminating those benefits. Thus, because children in preapproved homes do not reside in "foster family homes" for purposes of section 672 of the Act, they are not "otherwise eligible" for foster care benefits within the meaning of paragraph four of the 1976 judgment. That is the only interpretation of the "otherwise eligible" language that is faithful to the injunction's purpose of eradicating the identified violation of federal law. The judgment cannot be read to confer benefits on children in preapproved homes to which the Act did not otherwise entitle them. Plaintiffs in the preapproved category were thus entitled to no relief in the district court under the terms of either the 1976 judgment or the Social Security Act.

### B. Due Process

The district court found that the proposed transition to HMR Reform also violates the procedural due process rights of children in approved and preapproved relative homes. The Director challenges this conclusion too, contending that the legislative reforms eliminated any property interest the children may have had in continued benefits, and alternatively, that the legislative process was all that was due. Having found that only those relative children residing in approved homes are entitled to relief under the earlier judgment, we must reach this constitutional question, as it also concerns the rights of children in preapproved homes.

In analyzing a claim under the Due Process Clause of the Fourteenth Amendment, we must answer two questions: first, whether plaintiffs were deprived of a protected property interest, and if so, what process was due them in connection with that deprivation. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982); *Somerset House, Inc. v. Turnock,* 900 F.2d 1012, 1015 (7th Cir. 1990). The district court found that the foster care benefits here are a species of prop-

erty that is protected under the Constitution, and the State does not seriously contest that conclusion. Entitlements to a broad range of health and welfare benefits have been considered as "property" under the Due Process Clause. *See, e.g., Atkins v. Parker,* 472 U.S. 115, 128, 105 S.Ct. 2520, 2528, 86 L.Ed.2d 81 (1985) (food-stamp benefits); *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (disability benefits); *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (welfare benefits). The Director has offered no meaningful distinction between the benefits at issue in the cited cases and the foster care benefits that concern us here. Perceiving no distinction ourselves, we agree with the district court that foster care benefits are property for purposes of the Fourteenth Amendment.

The Director nonetheless contends that plaintiffs lack a protectable interest in that property because they have no legitimate claim of entitlement to foster care benefits after the effective date of HMR Reform. In *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Court explained that before an individual will be deemed to have a property interest in a benefit, he must show "more than an abstract need or desire for it.... He must, instead, [establish] a *legitimate claim of entitlement to it.*" (Emphasis added). Such a legitimate claim of entitlement, moreover, is "defined by existing rules or understandings that stem from an independent source such as state law." *Id.; see also Easter House v. Felder,* 910 F.2d 1387, 1395 (7th Cir.1990) (en banc), *cert. denied,* 498 U.S. 1067, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991). The Director does not contest that plaintiffs had a legitimate claim of entitlement to foster care benefits under Illinois law prior to the implementation of HMR Reform. He maintains, rather, that their interest cannot be judged under prior law, but only as of the July 1, 1995 effective date of the reforms. The Director argues that because the plaintiff children reside in homes that currently are unlicensed, they lack a legitimate claim of entitlement to foster care benefits under HMR Reform. Effectively, then, the Director is arguing that plaintiffs

lack a protectable property interest because the State of Illinois eliminated any entitlement they may have had when it reformed its foster care system.

 But that tautological argument misunderstands the due process jurisprudence of this court and the Supreme Court. Once a property interest has been created by a state, that interest may subsequently be eliminated, but only pursuant to constitutionally adequate procedures. *See Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985); *Logan,* 455 U.S. at 432, 102 S.Ct. at 1155–56. A state, in other words, may not defend against a due process claim, as the Director does here, by arguing that the plaintiff now lacks a protectable property interest by virtue of the very state action the plaintiff has challenged. *See Bennett v. Tucker,* 827 F.2d 63, 73 (7th Cir.1987) ("a state may not deprive an individual of his or her property interest without due process, and then defend against a due process claim by asserting that the individual no longer has a property interest."). The Supreme Court made a similar point in *Logan v. Zimmerman Brush Co., supra.* There, the Court rejected the theory that a state legislature, as the creator of an entitlement, can also establish the procedures under which that entitlement can be forever lost. 455 U.S. at 431–32, 102 S.Ct. at 1155–56. The required procedures are a matter of federal law, the Court said, which "'are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.'" *Id.* at 432, 102 S.Ct. at 1155–56 (quoting *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263 (1980)). Any other rule, the Court explained, "would allow the State to destroy at will virtually any state-created property interest." *Id.* Thus, once a state has created a property interest, the adequacy of the procedures employed to deprive an individual of that interest must be judged in constitutional terms. *Id.; see also Vitek,* 445 U.S. at 490–91, 100 S.Ct. at 1262–63. Plaintiffs therefore have a legitimate claim of entitlement to the foster care benefits they were receiving prior to the implementation of HMR Reform, and we must determine whether the procedures employed to deprive them of that interest were constitutionally adequate.

 The Director's argument regarding the second aspect of our inquiry is more powerful. The Director contends that even if these plaintiffs have a protectable property interest, the legislative process that led to the elimination of their benefits provided all the process that was due. *See Atkins v. Parker,* 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985).

*Atkins* involved a congressional amendment to the Food Stamp Act that reduced the percentage of earned income that could be deducted in determining eligibility for program participation. Because the amendment effectively increased the income reported by nearly all participating households, it "caused a reduction of benefits in varying amounts, or a complete termination of benefits, for families whose income placed them close to the border between eligibility and ineligibility." 472 U.S. at 118, 105 S.Ct. at 2523. When the State of Massachusetts attempted to implement the change, its food-stamp recipients argued that the State had provided them with deficient notice and had violated their due process rights by failing to apprise each household of the amendment's particularized effect. Although the lower courts agreed, the Supreme Court reversed, concluding that a particularized notice was not required because the legislative process provides all that is due when the benefit levels of a food-stamp recipient are so adjusted. *Id.* at 130, 105 S.Ct. at 2529; *see also Logan,* 455 U.S. at 432–33, 102 S.Ct. at 1155–56; *Bi–Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915). The Director contends that this case, which also involves a substantive change to the scope of a welfare benefit program, is indistinguishable from *Atkins.* According to the Director, then, *Atkins* compels the conclusion that the legislative process satisfied the State's Fourteenth Amendment responsibilities.

The district court distinguished *Atkins,* however, by focusing on the Supreme Court's observation that the Massachusetts legisla-

tive initiative applied across-the-board and did not involve "the procedural fairness of individual eligibility determinations." *See Atkins,* 472 U.S. at 129, 105 S.Ct. at 2529. The district court emphasized that plaintiffs do not challenge the substance of the reforms adopted by the state legislature; indeed, they readily concede that the Illinois General Assembly may restrict foster care benefits to children in licensed homes. Plaintiffs, who all were receiving foster care benefits prior to the implementation of HMR Reform, challenge only the State's failure to provide them an opportunity to qualify under the new system before their benefits are eliminated. (*See* Dist.Ct.Mem.Op. at 31.) The district court believed that *Atkins* did not control plaintiffs' claim to individual determinations of eligibility for continued benefits under the altered program.

The Director contests this distinction, insisting that the plaintiffs in *Atkins* also sought individual determinations about the effect of a legislative change. Plaintiffs emphasize, however, that because *Atkins* involved an across-the-board change in the method of computing income, no individual eligibility determination could prevent or alter the reduction in benefits occasioned by the legislation. Even so, food-stamp recipients affected by the change could request a hearing and have their benefit levels frozen in the interim. 472 U.S. at 128, 131 n. 35, 105 S.Ct. at 2528, 2530 n. 35. Here, by contrast, HMR Reform merely adds an additional eligibility requirement (licensure) that

most if not all approved and preapproved homes could meet if given an opportunity to do so. Plaintiffs therefore argue that whether or not a particular household can satisfy the additional requirement, and thereby retain existing benefits, requires an "individual eligibility determination" under *Atkins*.[14]

Plaintiffs argument finds support in the Ninth Circuit's recent decision in *Greene v. Babbitt,* 64 F.3d 1266 (9th Cir.1995). There, the Chairman of the Samish Indian Tribe argued that the federal government violated the due process rights of Tribe members when it ceased paying certain benefits on the ground that theirs was not a federally-recognized tribe. The federal-recognition requirement had been added by Congress in the early 1970s, when individual members of the Samish Tribe were already receiving federal benefits. 64 F.3d at 1269, 1274. The Tribe argued that the government could not eliminate the benefits of its individual members on this ground without providing a hearing to determine whether the Samish Tribe met the requirements for federal recognition. The Ninth Circuit noted that under *Atkins,* the legislative process generally provides all the process that is due when Congress alters the eligibility criteria for federal programs. *Id.* at 1273. Yet because Congress had only "narrowed eligibility for fundamental health and welfare benefits by conditioning eligibility on tribal recognition," the Ninth Circuit held that "the due process clause requires a meaningful hearing to determine whether

---

14. Plaintiffs therefore distinguish the many cases that have applied *Atkins* to legislative changes that eliminate or fundamentally alter a benefit system from those that add an additional eligibility requirement that current recipients are capable of meeting through further action. In each of the cited cases, as in *Atkins,* there was no action an affected individual could take to avoid the impact of the challenged legislation. Hence, there was no "individual eligibility determination" to be made. *See, e.g., Story v. Green,* 978 F.2d 60, 63 (2d Cir.1992) (New York's repeal of exemption previously enjoyed by disabled veterans from a city's regulation of street peddling); *Rosas v. McMahon,* 945 F.2d 1469, 1475 (9th Cir.1991) (amendment that increased the types of income to be included in determining eligibility for AFDC program); *Hoffman v. City of Warwick,* 909 F.2d 608, 619–20 (1st Cir.1990) (repeal of state statute granting enhanced seniority to returning war veterans); *Slaughter v. Levine,* 855 F.2d 553 (8th Cir.1988) (amendment providing that a family receiving nonrecurring lump-sum income (*e.g.,* an inheritance) is ineligible for AFDC benefits for the number of months that income would satisfy the family's standard of need); *Oliver v. Ledbetter,* 821 F.2d 1507, 1515–16 (11th Cir.1987) (new regulation requiring that Old Age, Survivors, and Disability Insurance benefits received by one child must be included in calculating, for AFDC eligibility purposes, available income of co-resident sibling); *Gattis v. Gravett,* 806 F.2d 778, 780–81 (8th Cir.1986) (amendment withdrawing "persons holding the rank of major and above" from personnel covered by state civil service provisions); *Frock v. United States R.R. Retirement Bd.,* 685 F.2d 1041 (7th Cir.1982) (statute eliminating right to receipt of dual benefits under two federal programs), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983).

those previously eligible can meet the new and narrowed requirements." *Id.* The protections of the Due Process Clause would be seriously impaired, the court observed, if the government were allowed "to cut off benefits without a hearing by creating new eligibility requirements and then summarily holding that current benefit recipients do not meet the new requirements." *Id.* (internal quotation omitted). Thus, once "Congress determined that tribal recognition was a prerequisite to benefits previously received on an individual basis, due process required the agency charged with administration of the requirement to afford a meaningful hearing for those who would be deprived of benefits." *Id.* at 1274.

We find the circumstances here to be virtually indistinguishable from those in *Greene*. The plaintiffs here, like the individual Samish Tribe members in *Greene*, were receiving government benefits prior to a legislative change that imposed a new eligibility requirement. The effect of that change, both here and in *Greene*, was to eliminate (at least temporarily) the benefits of current recipients while they attempted to satisfy the new requirement. Although the Illinois General Assembly was as free as Congress to alter its benefit program by adding a new eligibility requirement, we agree with the Ninth Circuit that the Due Process Clause does not permit the State to withhold benefits without determining whether current recipients can meet the new requirement. *See Greene*, 64 F.3d at 1273. Just as the individual Tribe members in *Greene* were entitled to a hearing on the federal recognition question before the government could eliminate their benefits, plaintiffs here are entitled to a DCFS determination on the licensing question before the Director may deprive them of foster care benefits. The fact that the plaintiff children currently reside in homes that are not licensed is not controlling, just as the lack of federal recognition for the Samish Tribe did not control the analysis in *Greene*. In both cases, due process requires that the governmental agency provide current recipients the opportunity to establish eligibility under the new standards *before* their benefits may be eliminated. *Id.* at 1274. That is particularly true in this case, where the district court found as a factual matter that DCFS is primarily responsible for the fact that plaintiffs currently reside in unlicensed relative homes.

We similarly agree with the Ninth Circuit that *Atkins* does not control in these circumstances. The Court in *Atkins* was careful to distinguish the legislative change there from one involving individual determinations of program eligibility. *See* 472 U.S. at 129, 105 S.Ct. at 2529. Indeed, the Court indicated that its conclusion would be different if the benefit reductions "were based on individual factual determinations, and notice and an opportunity to be heard had been denied." *Id.* at 131 n. 35, 105 S.Ct. at 2530 n. 35. There was no such factual determination in *Atkins* because the statutory amendment only required a simple calculation of household income under a new formula based on a static set of facts. That is not the case here, however, because HMR Reform merely imposes an additional eligibility requirement, which necessarily requires the State to determine whether existing recipients can meet the new requirement. Rather than affording plaintiffs that opportunity prior to terminating their benefits, DCFS made the blanket determination that all approved and preapproved relative homes do not satisfy the new requirement because they currently are unlicensed. *Cf. Greene*, 64 F.3d at 1273. Yet many of the affected homes could satisfy the new requirement if given an adequate opportunity. Indeed, many already have been approved by the State as meeting its licensing standards. They did not take the additional steps necessary to obtain a license only because the absence of a license had no effect on the foster care benefits of resident children. We therefore hold that if a currently unlicensed home submits a timely license application, the Director may not terminate the benefits of resident children until DCFS has rendered a decision on the application. *See Greene*, 64 F.3d at 1273–74; *cf. Atkins*, 472 U.S. at 128, 131 n. 35, 105 S.Ct. at 2528, 2530 n. 35 (current benefit levels frozen if food-stamp recipient requested individual hearing).

■ Illinois has treated approved and preapproved relative homes differently in implementing HMR Reform, providing a transi-

**1292**

tion process (albeit attenuated) to children in approved but not preapproved homes. Because children in both types of homes were eligible to receive benefits under Illinois law prior to HMR Reform, however, and may be equally capable of meeting the new licensing requirement, children in both types of homes are entitled to the same due process protections. We in any event conclude that the process provided to homes in both categories is constitutionally deficient.

First, HMR Reform provides a process under which approved homes may attempt to become licensed while resident children retain their former benefits. That process is fundamentally flawed, however, in that it sanctions the elimination of benefits on a specified date even where a home has submitted a timely license application and the Department has yet to render a decision. The Due Process Clause requires at the very least that benefits not be terminated unless and until DCFS considers and denies the application. *See Logan*, 455 U.S. at 434–35, 102 S.Ct. at 1157; *Penn Cent. Corp. v. United States R.R. Vest Corp.*, 955 F.2d 1158, 1161–62 (7th Cir.1992) (due process rights of railroad violated where only available predeprivation process could not provide effective relief before the property interest would be lost); *see also Carey v. Quern*, 588 F.2d 230, 232 (7th Cir.1978) ("due process requires at least that the assistance program be administered in such a way as to insure fairness and to avoid the risk of arbitrary decision-making."). We agree with the district court, then, that the benefits of children in approved homes may not be eliminated unless DCFS has processed and denied, after adequate consideration, the license applications of the homes in which they reside.

Children in preapproved homes are provided even less protection under HMR Reform. Indeed, because no transition process was provided to these children, the Director elim-

inated their benefits in July of this year, after enforcement of the district court's injunction was stayed. But as explained above, the Due Process Clause requires that like approved homes, preapproved homes be provided the opportunity to have a license application considered and determined on its merits before the benefits of resident children may be eliminated. The Director has therefore violated the due process rights of these children by discontinuing their benefits without providing such an opportunity.

## C. Relief

■ To remedy the violations it identified, the district court first enjoined the Director from terminating the foster care benefits of children in approved and preapproved relative homes until it had provided those homes an opportunity to have a license application determined on its merits. The district court intends to require, moreover, that DCFS provide to relative caregivers an additional notice of the changes effected by HMR Reform and to include a license application with that notice. Relative caregivers would then be given thirty-five days from the date of mailing to submit the application, with resident children retaining their benefits until the Department renders a decision. The court's order would also require the Director to make a caseworker available for questions and to provide other assistance to relative caregivers.[15] The Director maintains that the details of this injunction violate principles of comity and federalism and that he, and not the district court, should get first crack at implementing HMR Reform within the parameters of the Constitution and federal law.

It is true that in any given situation, there may be more than one permissible method of remedying a constitutional violation, whether it arises under the Due Process or the Supremacy Clause. *See Jefferson v. Hackney*, 406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731–32,

15. As far as we can tell, the district court intends these procedures to apply to approved and pre-approved relative homes alike. We are unsure that further notice is required for approved relative homes, however, as they already were notified of the transition process available to them and were provided with a license application. Indeed, the Director's counsel told us at oral argument that by July 1, 1995, approximately ninety percent of approved homes had applied to be licensed. We also did not understand plaintiffs to have argued below that the notice provided by the Department to approved homes was inadequate. Because the notice requirement of the district court's injunction will in any event be stricken for the reasons explained in the text, we shall leave resolution of this issue to the parties and the district court.

32 L.Ed.2d 285 (1972); *Jenkins v. Bowling,* 691 F.2d 1225, 1234 (7th Cir.1982). The district court has articulated what it considers to be the minimum relief necessary to satisfy due process and the 1976 judgment. (Dist. Ct.Mem.Op. at 37.) As a result of this appeal, however, the district court has not yet entered a final decree, and before doing so, it intended to consider the Director's objections to the relief it had proposed. (*Id.* at 38.) Although the requirements of the district court's order strike us as reasonable, at least as applied to preapproved homes, we agree that the Director should be afforded the first opportunity to propose a constitutional transition procedure. *See Pennington v. Didrickson,* 22 F.3d 1376, 1388 (7th Cir.1994) (task of federal courts is to determine whether state statutory scheme conflicts with the Constitution or federal law, and not to mandate a more compatible alternative), *cert. denied,* —— U.S. ——, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *Jenkins,* 691 F.2d at 1233–34. The federal courts need only at this point decree that the current implementation plan is invalid and that the Director may not eliminate the foster care benefits of children in relative homes until he has provided those homes an adequate opportunity to become licensed. *See Association of Community Org. for Reform Now (ACORN) v. Edgar,* 56 F.3d 791, 797–98 (7th Cir.1995); *Jenkins,* 691 F.2d at 1234. The district court will of course ensure that any alternative plan is consistent with our decision today.

### D. Plaintiffs' Cross–Appeal

■ Plaintiffs have cross-appealed from the district court's refusal to require the Director to permit administrative appeals from adverse licensing decisions. In refusing to grant this request, however, the district court did not consider the issue on its merits, noting instead that the information provided by the parties to date was insufficient to enable the court to reach a definitive conclusion on the issue. The court therefore expressly limited the scope of its June 30, 1995 opinion and order to the legality of the transition process without deciding whether administrative appeals were in fact available under HMR Reform or were required as a matter of law. (*See* Dist.Ct.Mem.Op. at 25–26.) Although we have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) over an appeal from an order denying an injunction, we believe the administrative appeal issue must be developed further in the district court, and decided on the merits there, before we should consider it on appeal. *See, e.g.,* Circuit Rule 50 (requiring district court to provide its reasons when entering an appealable interlocutory order). At present, there is nothing in the record to establish definitively whether or not the Director has provided all plaintiffs with the right to appeal an adverse licensing decision and whether he intends to continue to pay benefits during the pendency of such an appeal. The district court also has expressed no opinion on whether appeals and continued benefits are required under the Social Security Act or the Due Process Clause. Plaintiffs should further develop this issue before the district court and obtain a definitive ruling on the merits there before bringing the issue to this court.

### III. CONCLUSION

We agree with the district court that Illinois' transition to HMR Reform violates the due process rights of children residing in approved and preapproved relative homes. The transition also violates paragraph four of the 1976 judgment by denying benefits to children in approved relative homes. Plaintiffs are therefore entitled to an injunction that prohibits the Director from terminating their foster care benefits until he has provided them with an adequate opportunity to have a license application determined on its merits. The district court must nonetheless strike those portions of its order mandating an alternative means of implementing HMR Reform in order to permit the Director to propose his own procedure. With that exception, the injunction challenged in the Director's appeal is affirmed. We similarly affirm, at this time, the order denying a further injunction that is challenged in plaintiffs' cross-appeal. The parties shall each recover the costs they incurred in defending the other's appeal. The stay entered on October 10, 1995, is dissolved.

IT IS SO ORDERED.